## The C., R. I. & P. R. Co. v. Grinnell.

**1. Public Lands:** RAILROAD GRANT: WHEN IT ATTACHED. The grant of lands by act of Congress of May 15, 1856, to aid *inter alia* in the construction of a railroad from Davenport to Council Bluffs, operated as a grant *in præsenti*, and the survey and location of the road by the company, and the filing of a map thereof in the proper office, designated the lands which passed under the grant, not only within the six-mile limit, but also the deficiency lands within the fifteen-mile limit.

**2.** ———: ———: ACT OF JUNE 2, 1864. The act of June 2, 1864, authorizing a change in the line of the railroad, did not have the effect to divest the railroad company of the lands which had passed to it under the grant.

**3.** ———: ———: SELECTION. The fact that the selection of indemnity lands was made prematurely by one who had not been appointed by the State as its agent is immaterial, the selections made by him having been ratified by both State and Federal governments, and the lands so selected having been certified as within the grant.

**4.** ———: ———: TIME OF CONSTRUCTION. The United States alone could enforce a forfeiture of the grant, on the ground that the road was not completed within the time limited by the congressional grant.

*Appeal from Shelby Circuit Court.*

SATURDAY, JUNE 14.

ACTION at law to recover the possession of a quarter section of land situated in Shelby county. There was a verdict and judgment for plaintiff. Defendant appeals. The facts of the case fully appear in the opinion.

*Sapp, Lyman & Ament,* for appellant.

*Thomas F. Withrow* and *Wright, Gatch & Wright,* for appellee.

BECK, CH. J.—I. The leading questions of law involved in this case are important, and not without difficulty in their solution, and one of them, at least, has never before been passed

The C., R. I. & P. R. Co. v. Grinnell.

upon by the courts. The case has been argued before us by counsel on both sides with great ability, and with that thoroughness and clearness which manifest extensive research, and complete familiarity with the law and the facts involved in the case. It is, indeed, the good fortune of this court to have so important a case presented in this thorough and able manner. Many questions are discussed by counsel, which, in the view we take of the case, are unimportant. They will not, therefore, be considered in this opinion.

II.   The cause was submitted to the jury upon an instruction directing them to return a verdict for plaintiff on the ground that the evidence showed the title of the land in controversy to be in plaintiff. Many errors are assigned relating to rulings upon the admission of testimony, etc. These objections relate to the very right of plaintiff to recover, and assail its title to the land. Counsel for defendant do not discuss their assignment of errors point by point, but more correctly consider the case upon the facts disclosed in the record, and thereon maintain that plaintiff has failed to establish title to the land. We will discuss the case in the same manner.

The controlling facts of the case, which it becomes necesary to consider, are as follows:

The land in controversy is claimed by plaintiff under a grant made by Congress to the State, to aid in building a railroad from Davenport to Council Bluffs, and a grant made by the State to the corporation under which plaintiff claims, for the purpose of carrying out the object of the congressional grant. The issues of the case require us to determine whether the land in controversy is covered by these grants, and whether the title passed thereby and by assurances executed under the grants.

The congressional grant was by the act of May 15, 1856. The parts of this act which we are called upon to interpret are as follows:

"Section 1.   That there be and is hereby granted to the State of Iowa, for the purpose of aiding in the construction.

of railroads," [four roads are named, among others the rail-road from Davenport to Council Bluffs,] "every alternate section of land, designated by odd numbers, for six sections in width, on each side of said road. But in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the Governor of said State, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the rights of pre-emption have attached as aforesaid; which lands, thus selected in lieu of those sold, and to which pre-emption rights have attached, as aforesaid, together with the sections and parts of sections and odd numbers, as aforesaid, and appropriated, as aforesaid, shall be held by the State of Iowa, for the use and purpose aforesaid: *provided*, that the land to be so located shall in no case be further than fifteen miles from the lines of said roads, and selected for and on account of said roads severally, shall be exclusively applied in the construction of that road for and on account of which such lands are granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever: *and provided further*, that any and all lands heretofore reserved to the United States, by an act of Congress, or in any other manner, by competent authority, for the purpose of aiding in any objects of internal improvements, or for any other purpose whatsoever, be and the same are hereby reserved from the operations of this act, except so far as it may be found necessary to locate the route of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States.

"Section 3 .*And be it further enacted,* That the said lands hereby granted to the said State shall be subject to the disposal of the Legislature thereof for the purpose aforesaid and no other; and the said railroads shall be and remain public highways for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States."

"Section 4. *And be it further enacted,* That the lands hereby granted to said State shall be disposed of by said State only in manner following, that is to say: that a quantity of land, not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each of said roads, may be sold; and when the Governor of said State shall certify to the Secretary of the Interior that any twenty continuous miles of any of said roads are completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of said roads, may be sold, and so, from time to time, until said roads are completed; and, if any of said roads are not completed within ten years, no further sales shall be made, and the lands unsold shall revert to the United States."

The State, by the act of July 14, 1856, accepted the grant of Congress, and regranted and conferred the lands appropriated to aid in building a railroad from Davenport to Council Bluffs to and upon the Mississippi & Missouri Railroad Company. We may have occasion hereafter to refer to the provisions of this act, and of an act supplemental thereto, approved January 28, 1857.

The Mississippi & Missouri Railroad Company filed in the General Land Office at Washington, on the 11th day of September, 1856, a map showing the proposed line of its road. A supplemental and corrected map was filed April 1, 1857, showing substantially the same route as the original or first map, and correcting certain defects therein.

On the 4th day of September, 1856, Bernhart Henn, under authority and as agent of the Mississippi & Missouri Railroad Company, selected the unsold lands in the sections and part of sections designated by odd numbers, between the six and fifteen-mile limits of the road, to make up the deficiency of the grant caused by sales and pre-emption. The Commissioner of the General Land Office was advised of this selection by a letter of Mr. Henn. The lands enuring under this grant were certified to the State by the Commissioner of the General Land Office, December 27, 1858. The railroad was completed from Davenport to Kellogg, a distance of one hundred and thirty miles, in 1864, upon the route as indicated in the maps above mentioned. By act of Congress, approved June 2, 1864, the Mississippi & Missouri Railroad Company was authorized to "modify and change the location of the uncompleted portion of its line, as shown by the map thereof, * * * * * so as to secure a better and more expeditious line for connection with the Iowa branch of the Union Pacific Railroad." The second section of the act is as follows:

"Section 2. *And be it further enacted,* That whenever such new location shall have been established the said railroad company shall file in the General Land Office at Washington a map definitely showing such new location; and the Secretary of the Interior shall cause to be certified and conveyed to said company from time to time as the road progresses, out of any public lands now belonging to the United States not sold, reserved or. otherwise disposed of, or to which a pre-emption claim or right of homestead settlement has not attached, and on which a *bona fide* settlement and improvement has not been made under color of title derived from the United States or from the State of Iowa, within six miles of such newly located line, an amount of land per mile equal to that originally authorized to be granted to aid in the construction of said road by the act to which this is an amendment; and if the amount of land granted by the original act to aid in the construction of said railroad shall not be found within the

limit of six miles from such line, then such selections may be made along such line within twenty miles thereof: *provided,* that the said company shall not be entitled to, and shall not receive, any land under this grant which is situate within fifteen miles of the line of the Burlington & Missouri River Railroad, as indicated by the map of said road, now on file in the General Land Office."

The plaintiff in 1866 became the purchaser of the railroad, and all the title and interest of the Mississippi & Missouri Railroad Company to and in the lands granted by the legislation above recited, upon the foreclosure of a mortgage executed by the last named corporation under authority conferred by an act of the Legislature.

The plaintiff availed itself of the privilege of changing its route granted by the foregoing act, and located its road on a new line so far south of the old line that the twenty-mile limits of the later act do not reach as far as the fifteen-mile limits of the first grant, leaving a strip of land between the respective limits which, at some points, is five miles in width. The lands in controversy are within the fifteen-mile limits of the old line.

The railroad was completed to Council Bluffs June 6, 1869, and a map, showing the new and old line, was filed in the proper office in January, 1870. The defendant in 1872 settled upon the land in controversy, intending to acquire and occupy it as a homestead, under the laws of the United States. He made applications as required by the homestead laws, which he sought to file in the land offices, but was refused.

III. We are first required to determine the force and effect of the original grant to the State, under the act of Congress of 1. PUBLIC lands: railroad grant: when it attached. May 15, 1856. The act, it is conceded by counsel of both parties, operates as a grant *in præsenti,* and attached to lands, when designated, according to the provisions of the statute, as the subject of the grant. Upon this proposition there is no dispute. In what manner does the act provide for the designation of the lands, so that

the grant will attach?   The lands within the six-mile limit are designated as being those of odd numbers on each side of the road; the deficiency lands are to be selected.   When the statute was enacted the railroad had no existence.   The object of the grant was to aid in the construction of a road in contemplation—to aid in creating such a railroad.   It was well understood by Congress that the building of railroads, like all other great enterprises, required forethought and preparation, by the adoption of plans as to the character and extent of the work, and the means for accomplishing it.   Indeed, the act itself exhibits such forethought and preparation in designating the *termini* of the road, and in making the grant, in order to provide means for the accomplishment of the enterprise. It was, therefore, well understood by Congress that, before the railroad would or could be constructed, a route must be surveyed and adopted.   It could not have been expected that so great a work would be prosecuted without fixed plans and designs as to the course and line of the road.   Congress well knew that the line of the railroad would be surveyed and adopted by the State, or by the persons, natural or artificial, that should undertake to construct it.

The survey of the route and the location of the line of the railroad is a part of the work of construction.   These are the beginning of the work, it is true, but are nevertheless a part of the work, and a very important part.   They demand great skill and wisdom, and a very considerable outlay of money; of necessity they are, as we have said, the first work to be done.   When done, the route or line of the road is fixed— definitely fixed.   The railroad has then assumed a form and an existence; as an embryo, it is true, but nevertheless an existence of the character that is at the beginning of all things which do not spring up complete by the magic of a word or a single act.   The line surveyed and adopted is just as definitely fixed, as permanently located, as it is after the road is built.   In either case it may be changed by the exercise of the will of those having control of the road.   In

the exercise of that will the line of the road, when the survey is adopted, may be changed before the work is commenced; so it may be changed at any time afterward, even when the road is fully completed and in operation. The effect of a change in one case is not different from a change in the other. In neither case would the fact of the change lead to the conclusion that the railroad had not been definitely located by the survey first adopted. It is true that it may not be said to be permanently located, for nothing that depends upon the changeable will of man is permanent. The plaintiff's railroad to-day cannot be said to be permanently, unchangeably located, except as to the points fixed by the statutes under which it received the grant of lands. If the interest of trade requires changes at particular points they may be made. The line of the road to-day, however, is definitely fixed—unmistakably located; but no more definitely fixed than when the survey was first made and adopted. We conclude, therefore, that the survey and location of plaintiff's railroad, and the filing of a map thereof in the proper office, designated the lands with the six-mile limits to which the grant at once attached. So the selection outside of these limits and within fifteen miles of the road, in the manner prescribed by the act, designated the deficiency lands, and they passed under the grant. These views are supported by the following cases: *Lessieur v. Price*, 12 How., 59; *Hedrick v. Hughes*, 15 Wal., 123; *Schulenberg v. Harriman*, 21 Wal., 44; *Railroad Land Co. v. Courtright*, 21 Wal., 310.

Another thought will support our conclusion. The grant was made to aid in the construction of the railroad. It is a matter of history that such enterprises are largely carried forward by the sale of bonds, secured upon the property of the corporations building the roads. It was, doubtless, the expectation of Congress that the plaintiff's railroad would be built in the usual manner. Unless the grant attached to the lands before the road was completed, it is difficult to see how the company could raise money in the ordinary manner

by bonds and mortgages. It is reasonable that these considerations had due influence in determining the conditions of the grant.

IV. The grant having attached, upon the line of the road being definitely fixed, and the indemnity lands being duly selected, the company, to whom the State transferred the property, acquired a valid and certain interest in the identical lands designated by such location of the road and selection. This interest and title, it is true, was conditional, depending upon the completion of the railroad, but could not have been defeated except for non-performance of that condition. It was held by the Mississippi & Missouri Railroad Company, under the grant of the State, as all other property of which it could not have been deprived by legislation, either State or National. But in our opinion the act of June 2, 1864, authorizing a change in the line of the railroad was not an attempt to do this. The language of the act does not express such intention, which courts will not infer by construction. We will never presume vested rights are assailed by legislation. The language of the Legislature must be plain and explicit to authorize such a conclusion. It is not within our duty in this case to consider the construction and effect of this statute further than to hold that it does not divert the grant under which the title to the lands in question vested.

The act of the Legislature of the State, conferring these lands upon the Mississippi & Missouri Railroad Company, authorized that company to execute mortgages upon the property. Plaintiff's title is lawfully acquired under the foreclosure of a mortgage executed in pursuance of this authority. Subsequent legislation of the State recognized plaintiff's title to the lands. It has been recognized in a like manner by congressional legislation. The courts must regard it valid, under the principles and for the reasons we have attempted to present.

Defendant's settlement and claim under the homestead

The C., R. I. & P. R. Co. v. Grinnell.

laws of the United States, having been made after the title to the land had passed from the government and vested in plaintiff, are void and cannot protect defendant's possession.

V. Two or three objections urged by defendant's counsel demand consideration. It is said that the selection of the 3. ——: ——: indemnity lands was prematurely made by one selection. who had not been appointed by the State as an agent for that purpose. Let this be admitted. But both the State and Federal governments have recognized the selections made, and certified the lands covered thereby as within the grant; the original parties to the grant, the grantee of the State, and the plaintiff, who succeeded to its rights, have all, for more than twenty years, acquiesced in the selection of the lands. They are each surely bound thereby; it is not competent for a mere stranger to assail the title on this ground.

VI. The railroad was not completed within the time limited by the congressional grant. It is insisted that plaintiff's 4. ——: ——: title is defeated under this condition. But it will time of construction. be observed that the title under the grant vested in the grantee upon the line of the road being definitely fixed and the indemnity lands being selected. The condition requiring the road to be constructed within a time prescribed was subsequent. It could be waived by the grantor, and a failure to enforce a forfeiture and the final certification of the lands would be regarded as a waiver. The United States having failed to enforce the forfeiture, no other party can; the title, therefore, remains unimpaired in plaintiff. *Schulenberg et al. v. Harriman*, 21 Wal. 44; *Tucker v. Ferguson*, 22 Id., 527; *Barrett v. Brooks*, 21 Iowa, 144; *Keltner v. Story County*, 28 Id., 35.

VII. The views we have expressed and the conclusions we have announced render the consideration of other questions discussed by counsel unnecessary. Other arguments could be presented, based upon the facts herein set out, and other facts could be presented from the record, supporting other arguments, all of which would give support to our conclusion.

But the arguments we have presented are so satisfactory to our own minds that we deem it quite unnecessary to present others in support of our conclusions, which dispose of the case.

It is our opinion that the judgment of the Circuit Court ought to be

AFFIRMED.

Twenty-three other cases, which need not be named by their titles here, were submitted upon the same abstract with this case. Their titles fully appear in the abstract and additional abstracts filed by defendant. The identical questions decided in this case arise in those. The judgments of the court below were the same as the judgment appealed from in this case. The defendants in each case appealed. A judgment of affirmance will be entered in each case.