# CEDAR RAPIDS & MISSOURI RIVER RAILROAD COMPANY and Another *v.* HERRING.

## SAME *v.* LAKE.

## SAME *v.* IDDINGS.

## SAME *v.* CUTLER.

## SAME *v.* DUNDON.

## SAME *v.* BROOKS.

## SAME *v.* GREENSTREET.

## SAME *v.* WOOSTER.

## SAME *v.* BOYD.

## SAME *v.* JEWELL & Others.

ALL IN ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

Argued December 6th and 7th, 1883.—Decided January 7th, 1884.

*Land Grants—Railroads—Statutes.*

1. It has been the invariable policy of Congress to measure the amount of public lands granted to a land-grant railroad by the length of the road as actually constructed, and not by its length as originally located ; and there is nothing in the statutes of Congress or of the State of Iowa applicable to the grant of public lands in favor of the plaintiffs in error which indicates a different purpose, or which warrants the claim that the number of sections which they are entitled to receive is to be estimated by the standard of the original location of the road.

2. When Congress grants to a State for a railroad company every alternate section of land designated by odd numbers within a given distance from the line of the road, and directs the Secretary of the Interior, when a map shall be filed in that department, showing the location of the road, to reserve the sections, and further provides that in case it is found that the United States had disposed of any of these odd sections, or rights attached to them, by pre-emption or otherwise, the grantee may select other alternate odd sections within another and greater distance from that line, the filing of the map cuts off the right of entry of the odd sections within the first named distance ; but it confers no rights to specified tracts within the secondary or indemnity tract, until the

grantee's right of selection has been exercised ; and that right cannot be exercised until the entire road has been completed.

3. The act of June 2d, 1864, § 4, 13 Stat. 96, 97, construed.

These are ten writs of error to the Supreme Court of the State of Iowa to review judgments in that court of affirmance in favor of the parties named. The railroad company was plaintiff in the inferior State court, and on appeal in the Supreme Court of the State, and in the writs of error in this court.

The suit in the court of original jurisdiction was in the nature of a bill in chancery to quiet title, and to compel a conveyance of the legal title held by defendants under patents from the United States to plaintiff, who asserted title to it in equity.

The cases all depend on the same pleadings and evidence, and were consolidated in the inferior court, and have been considered and argued together in the Supreme Court of Iowa, and in this court, except No. 1139, the Jewell case, which is submitted in this court on the same argument.

*Mr. E. S. Bailey* and *Mr. W. L. Joy* for plaintiffs in error.

*Mr. John S. Monk* for defendants in error.

MR. JUSTICE MILLER delivered the opinion of the court.

The defendants are in possession of the land in controversy in each case under a purchase from the United States with a patent from the government, and the plaintiff, the railroad company, asserts a superior title, either legal or equitable, under certain land grants by act of Congress to aid in building railroads. The first of these acts is that of May 15th, 1856, 11 Stat. 9, by which Congress granted lands lying within the State of Iowa to that State to aid in building four principal railroads from the Mississippi to the Missouri River. One of these was for a road "from Lyons City, on the Mississippi River, to a point of intersection with the main line of the Iowa Central Air Line Railroad near Maquaketa, thence on said main line, running as near as practicable to the 42d parallel across the said State to the Missouri River." For each of

these roads there was given to the State of Iowa, "as soon as the road is completed, every alternate section of land designated by odd numbers for six sections in width on each side of each of said roads." And it was provided that if, when the line of a road was definitely located, it was found that the United States had disposed of any of these odd sections, or rights had attached to them by pre-emption or otherwise, an agent appointed by the State might, in lieu of these, select other alternate sections anywhere within fifteen miles of the line of the road.

The State of Iowa, by an act of the general assembly approved July 14th, 1856, accepted the trust reposed in it by the above act of Congress, and granted and conferred upon four corporations all these lands, under the terms and restrictions of the act of Congress. These corporations were to construct the roads across the State according to that act, and the corporation on whom was conferred the grant for a road from Lyons to the Missouri River was the Iowa Central Air Line Railroad Company.

The only result of this particular grant of the State was that the company received the 120 sections of land which this court held, in the case of the *Railroad Land Company* v. *Courtright*, 21 Wall. 310, could be secured before any road was built; but having built no road up to March 17th, 1860, the State, by an act of its legislature of that date, declared the grant forfeited and resumed control of it.

On the 26th of that month, by another act of assembly, the State granted the same lands to the Cedar Rapids and Missouri River Railroad Company—the plaintiff in error—upon conditions similar in all material respects to the grant to the Air Line Company.

The Air Line Company had before this time surveyed and located the line of the road from Lyons to the Missouri River through the town of Cedar Rapids, and the map of this survey and location had been accepted by the State of Iowa and the Land Office of the United States as the true line and as governing the location of the land grant for that road. A road had also been built by another company, the Chicago, Iowa

and Nebraska, which had no land grant, from a point on the Mississippi River within three miles of Lyons City to Cedar Rapids. Hence the grant of the State to the Cedar Rapids Company required them to build speedily from Cedar Rapids west along the line thus adopted to the Missouri River.

Under this arrangement the Cedar Rapids Company pushed its road on the designated line, so that it had completed about a hundred miles west of the town of that name by the year 1864, when several matters seemed to call for legislation by Congress in regard to it and to the other companies building roads across the State under the grants of the act of 1856.

As regards the Cedar Rapids Company, it had become clearly unnecessary to build another road from the Mississippi at Lyons to Cedar Rapids, along the line occupied by the Iowa and Nebraska road.

It had also become apparent that a shorter and better line to the Missouri River could be had from the point to which the road had now been constructed, and it was thought that a road from some point on its existing line to some point south of it, on the line of the Mississippi and Missouri River Railroad— one of the four land-grant roads—would be desirable. It had also been ascertained that the necessary quantity of lands in lieu of the odd sections disposed of within six miles could not be satisfied by *alternate* sections within the fifteen-mile limit.

In this condition of the matter Congress passed the statute on which the result of this litigation depends, which was approved June 2, 1864, 13 Stat. 95.

This statute, after granting certain relief to the Mississippi and Missouri Railroad Company, and to the Burlington and Missouri Railroad Company, two other of the land-grant roads in Iowa, proceeds in its fourth section to grant relief to the present plaintiff company.

The fourth section of that act—the one which we are required to construe—reads as follows:

"SEC. 4. *And be it further enacted*, That the Cedar Rapids and Missouri River Railroad Company, a corporation established under the laws of the State of Iowa, and to which the said State

granted a portion of the land mentioned in the title of this act, may modify or change the location of the uncompleted portion of its line, as shown by the map thereof, now on file in the General Land Office of the United States, so as to secure a better and more expeditious line to the Missouri River and to a connection with the Iowa branch of the Union Pacific Railroad; and for the purpose of facilitating the more immediate construction of a line of railroads across the State of Iowa, to connect with the Iowa branch of the Union Pacific Railroad Company, aforesaid, the said Cedar Rapids and Missouri River Railroad Company is hereby authorized to connect its line by a branch with the line of the Mississippi and Missouri Railroad Company; and the said Cedar Rapids and Missouri River Railroad Company shall be entitled, for such modified line, to the same lands and to the same amount of lands per mile, and for such connecting branch the same amount of land per mile, as originally granted to aid in the construction of its main line, subject to the conditions and forfeitures mentioned in the original grant, and, for the same purpose, right of way through the public lands of the United States is hereby granted to said company. *And it is further provided,* That whenever said modified main line shall have been established or such connecting line located, the said Cedar Rapids and Missouri River Railroad Company shall file in the General Land Office of the United States a map definitely showing such modified line and such connecting branch aforesaid; and the Secretary of the Interior shall reserve and cause to be certified and conveyed to said company, from time to time, as the work progresses on the main line, out of any public lands now belonging to the United States, not sold, reserved, or otherwise disposed of, or to which a pre-emption right or right of homestead settlement has not attached, and on which a *bona fide* settlement and improvement has not been made under color of title derived from the United States or from the State of Iowa, within fifteen miles of the original main line an amount of land equal to that originally authorized to be granted to aid in the construction of the said road by the act to which this is an amendment. And if the amount of land per mile granted, or intended to be granted by the original act, to aid in the construction of said railroad, shall not be found within the limits of the fifteen miles therein prescribed, then such selections may be made along said modified

line and connecting branch within twenty miles thereof: *Provided, however,* That such new located or modified line shall pass through or near Boonesboro, in Boone County, and intersect the Boyer River not further south than a point at or near Dennison, in Crawford County: *And provided further,* That in case the main line shall be so changed and modified as not to reach the Missouri River at or near the 42d parallel north latitude, it shall be the duty of said company, within a reasonable time after the completion of its road to the Missouri River, to construct a branch road to some point in Monona County, in or at Onawa City; and to aid in the construction of such branch the same amount of lands per mile are hereby granted as for the main line, and the same shall be reserved and certified in the same manner; said lands to be selected from any of the unappropriated lands as hereinbefore described, within twenty miles of said main line and branch; and said company shall file with the Secretary of the Interior a map of the location of said branch : *And provided further,* That the lands hereby granted to aid in the construction of the connecting branch aforesaid shall not vest in said company nor be encumbered or disposed of except in the following manner : When the Governor of the State of Iowa shall certify to the Secretary of the Interior that the said company has completed in good running order a section of twenty consecutive miles of the main line of said road west of Nevada, then the Secretary shall convey to said company one-third, and no more, of the lands granted for said connecting branch. And when said company shall complete an additional section of twenty consecutive miles, and furnish the Secretary of the Interior with proof as aforesaid, then the said Secretary may convey to the said company another third of the lands for said connecting branch; and when said company shall complete an additional section of twenty miles, making in all sixty miles west of Nevada, the Secretary, upon proof furnished as aforesaid, may convey to the said company the remainder of said lands to aid in the construction of said connecting branch: *Provided, however,* That no lands shall be conveyed to said company on account of said connecting branch road until the Governor of the State of Iowa shall certify to the Secretary of the Interior that the same shall have been completed as a first-class railroad. And no land shall be conveyed to said company situate and lying within fifteen miles of the original line of the Mississippi and

Missouri Railroad as laid down on a map on file in the General Land Office: *Provided, further*, That it shall be the duty of the Secretary of the Interior, and he is hereby required, to reserve a quantity of land embraced in the grant described in this section, sufficient in the opinion of the Governor of Iowa, to secure the construction of a branch road from the town of Lyons, in the State of Iowa, so as to connect with the main line in or west of the town of Clinton, in said State, until the Governor of said State shall certify that said branch railroad is completed according to the requirements of the laws of said State : *Provided, further*, That nothing herein contained shall be so construed as to release said company from its obligation to complete the said main line within the time mentioned in the original grant: *Provided, further*, That nothing in this act shall be construed to interfere with or in any manner impair any rights acquired by any railroad company named in the act to which this is an amendment, or the rights of any corporation, person or persons, acquired through any such company ; nor shall it be construed to impair any vested right of property, but such rights are hereby reserved and confirmed: *Provided, however*, That no lands shall be conveyed to any company or party whatsoever, under the provisions of this act and the act amended by this act, which have been settled upon and improved in good faith by a *bona fide* inhabitant, under color of title derived from the United States or from the State of Iowa adverse to the grant made by this act or the act to which this act is an amendment. But each of said companies may select an equal quantity of public lands as described in this act within the distance of twenty miles of the line of each of said roads in lieu of said lands thus settled upon and improved by *bona fide* inhabitants in good faith under color of title as aforesaid."

We are of opinion that the purpose of this enactment was—

1. To relieve the company from the obligation to build that part of its line as found in the land office, between the Mississippi River and Cedar Rapids, because there already existed a road between those points built by another corporation.

2. To require the company to connect the city of Lyons with that corporation's road, so that it would be, as originally intended, the Mississippi terminus of the land-grant road across

the State.   This required the construction of about two and a
half miles of road.

3. To authorize the company to change the location of its
road yet to be constructed west of Cedar Rapids for its con-
venience.

4. If this change left the city of Onawa, in Monona County,
off the line of the road, they were to build a branch to that
place.

5. To construct a new line connecting its existing road with
the road from Davenport on the Mississippi River, to Council
Bluffs, on the Missouri River.

6. To adjust the amount of lands, to which the company
would be entitled under this new order of things, and to enlarge
the source from which selections might be made for the loss of
that not found in place.

This latter it accomplished by declaring that *all* the sections
within the fifteen-mile limits shall be subject to such selection
on the same terms on which only alternate sections could pre-
viously be selected ; and if this limit, which had exclusive
reference to the line first located, did not satisfy the grant,
then selection could be made within twenty miles of the new line.

Before proceeding further it is as well to say that the short
road connecting the Iowa and Nebraska line with Lyons City
was built, the connection with the Mississippi and Missouri
River road was not built, and though the new line was
located fifteen miles or more from Onawa, the branch to that
city was not built.   The road of this company, as originally
located, from Lyons City to the Missouri River, was three
hundred and forty-five (345) miles in length, and as constructed
by the company, from Cedar Rapids to the Missouri River, it
is two hundred and seventy-one (271) miles long, making a dif-
ference of seventy-four (74) miles.

The plaintiff in error insists that, under the act of 1864, it is
entitled to six sections per mile, as measured by the original
location of the road, while defendants assert that the length of
the road, as constructed by the plaintiff, is to be taken as de-
termining the quantum of the grant.

This is the first and most important question in the case, as

argued by counsel, and decided by the Supreme Court of Iowa in favor of the latter proposition, and its importance depends upon the fact asserted by defendants, that the company has received all the land it is entitled to, without resorting to that which they have purchased from the government, and for which they hold its patents.  Manifestly, if this be so, plaintiff can have no just claim upon the lands of defendants, though they are all located within the fifteen-mile limit and outside of the six-mile limit.

It is believed that in no instance of the many grants of public land made by Congress to aid in building railroads, has the quantity been measured by any other rule than the length of the road constructed, or required to be constructed, by the grantee or its privy; and it would be the first departure from this principle known to us if in this case Congress intended to give the same amount per mile of land for road not constructed, and from the construction of which the grantee at its own request was released, as for road which it was required to build and which it actually built.  In the case of the additional road required to be built, as the Onawa branch, and in the new branch authorized to connect the main line with the Mississippi and Missouri River road, the old rule is adhered to, and a grant made of six sections per mile of this additional road which should be actually constructed.  It would therefore require very plain language in that part of the act of 1864 which defines the quantity of land to be taken by the company, under these new circumstances, to justify us in holding it to cover six sections per mile for road never to be constructed by this company, from the obligation to construct which it was relieved by this very act, and which was then already built by another company having no privity with the grantee in this case.

So far, however, from finding this plain language favoring that view, we are of opinion that its fair construction is in accord with the uniform policy of Congress on this subject, and with what the circumstances suggest as the reasonable intent of that body.

The section of the act which we have copied, after authorizing the change in the location of the line of the road and the

connection with the line of the Mississippi and Missouri Railroad Company, says:

"And the said Cedar Rapids and Missouri River Railroad Company shall be entitled *for such modified line* to the same lands, *and to the same amount of lands per mile,* and for such connecting branch to the *same amount of land per mile,* as originally granted to aid in the construction of its main line."

If Congress simply meant that the company, notwithstanding the change in the line of its road, should have the lands it would have had if it had built the whole of the original line, it would have been easy to express this purpose. In such case no description of the grant, as for such modified line, nor of the same amount of lands per mile, would have been necessary. If such was the purpose, the use of this language was unnecessary and was confusing. If, however, it was the purpose of Congress to measure this grant under the new circumstances by the length of the modified line and give the same number of sections per mile of the line thus modified, the language is, in our opinion, appropriate and unambiguous. The words " the same lands," which plaintiff's counsel insist mean *all* the lands of the old grant, are intended, we think, to show that the lands are to be taken along the line of the old survey; that the odd sections on each side of that old line which became vested in the State when it was established should be a part of the new grant to this company, and that the deficiencies should in like manner be made up by sections within the fifteen-mile limit of that line. This is confirmed by that part of the next sentence of this section, which directs the Secretary of the Interior, when the new line shall have been established, to reserve *all* the lands without regard to alternate sections within that limit, so far as may be necessary to satisfy these selections, for the loss of odd sections previously disposed of.

We see no error, therefore, in the ruling of the Supreme Court of Iowa that the quantity of the grant is to be determined by the length of the new lines, as constructed by the company.

The plaintiff, however, insists that, adopting this principle, there is still a deficiency of the grant of 292,019 acres, to supply which it is entitled to resort to the lands now in possession of defendant. The Supreme Court of Iowa, in the opinion delivered in the nine cases decided in 1879, conceded that the company had not received the full amount it was entitled to on this basis by about 5,000 acres, but as it had *selected* lands enough, not including those of defendants, and had not shown that those selections had been abandoned by the company, or disallowed by the land department, they had not shown a case for relief against the defendants.

In the case of Jewell, decided by that court in 1883, it is shown by a discussion of the deductions claimed by plaintiff, that 24,000 acres have been selected and claimed in excess of what the company is entitled to.

The questions on which these deductions depend, and what weight is to be given to the selection of other lands not yet certified to the company or approved by the Secretary of the Interior, are not free from difficulty, and are to us much more embarrassing than one which the Supreme Court in its last opinion seemed to have encountered and been unable to decide. In that opinion it is said:

"The counsel for the respective parties have discussed with great learning and ability the nature of the right which the railroad company acquired in the land in question by the passage of the act. We do not care to go into a consideration of this question. The company, doubtless, as against the United States, acquired, upon the construction of the road, the right to select and claim the land as a part of the intended indemnity, if the deficiency was such as to justify it. What right the company acquired previous to selection as against the defendant, a homestead settler, is a question which presents no little embarrassment, and upon which there is not, perhaps, entire harmony in the adjudication. As to this we are not at present entirely agreed. For the purpose of the opinion it may be conceded that the plaintiffs would be entitled to resort to this land if it were necessary to fill the required indemnity. But it will not be denied that if the indemnity has been filled, the interest in the land which the plain-

tiffs may have had prior thereto would be extinguished. As to whether it has been filled the parties differ widely. They differ, also, as to who has the burden of proof upon such question."

In the case of *Grinnell* v. *The Railroad Company*, 103 U. S. 739, this court said, in construing the granting clause of the original act of May 15th, 1856 :

" So far as lands are found in place whenever this is done " (that is, the location of the road filed in the proper office), " not coming within the exceptions as sold or held under pre-emption, the title, or at least the right, to this land in place is at once vested in the State or in the company to which the State has granted it, and the means of ascertaining precisely what lands have passed by the grant is to be found in the map of the line of the road, which is filed in the General Land Office under provisions of the statute. As regards the lands to be selected in lieu of those lost by sale or otherwise, it may be that no valid right accrues to any particular section or part of a section, until the selection is made and reported to the land office, and possibly not then until the selection is approved by the proper officer."

In the case of *Van Wyck* v. *Knevals*, 106 U. S. 360, the subject is discussed with exclusive reference to the old-numbered sections specifically granted, and it is there held that the adoption by the company of a surveyed line of the route of its road, and the filing of the map of the same with the Secretary of the Interior, cuts off the right of entry of these odd sections by any one else, whether there is a proclamation or order withdrawing them or not.

It is obvious, however, that the right to these odd sections, and the right to others in lieu of such odd sections as have been previously disposed of, depend upon very different circumstances, and it is not easy to see how rights can be vested in any particular section or sections of the latter class until it is ascertained how many of the original odd-numbered sections are thus lost, and until the grantee has exercised his right of selection.

These latter, unlike the odd numbers within the six-mile limit, are not ascertained and made specific by the protraction

of the established line through the maps of the public lands. They are not and cannot be made specific until the grantee's right of selection has been exercised.

This court, in construing the same clause of the grant to the California and Oregon Railroad Company, 14 Stat. 239, said:

"When the road was located and the maps were made, the right of the company to the odd sections first named became *ipso facto* fixed and absolute. With respect to the 'lieu lands,' as they are called, the right was only a float, and attached to no specified tracts until the selection was actually made in the manner prescribed."

Again:

"It was within the secondary or indemnity territory where that deficiency was to be supplied. The railroad company had not and could not have any claim to it until specially selected, as it was for that purpose." *Ryan* v. *Railroad Company*, 99 U. S. 382.

But from what shall the selection be made, and how long a time may the grantee have to make his selection?

The question presents itself in two aspects, namely, the right to make these selections as against the United States, the grantor of this right, and the right as against a purchaser from the United States before the selection is made. As regards the former, it is only important to consider when it commences in the present case, and we are of opinion that no right of selection in any of these lands accrues until the entire line of the road to be built has been established by the company, and filed in the General Land Office at Washington, and that until then no duty devolves on the Secretary to withdraw or withhold the land from sale or pre-emption.

This is the necessary inference from the language both of the original grant of 1856 and the amendatory act of 1864. The first declares:

"In case it shall appear that the United States have, when the lines and routes of said roads are definitely fixed, sold any sections

or parts thereof granted as aforesaid, or that rights of pre-emption have attached to the same, *then* it shall be lawful for any agent or agents, to be appointed by the Governor of said State, to select other lands."

It is only when the line and routes of the roads are definitely fixed that any right of selection exists. This must necessarily be so, because until then the quantity of land lost by the previous disposition of the odd sections cannot be known, and the number of sections to be selected can only then be ascertained.

And the act of 1864, under which plaintiff's claim can alone exist, while it directs the Secretary to withdraw from sale the lands from which these selections are to be made, only requires this to be done after the new line of the road shall have been so established.

The language is :

" And it is further provided, that whenever said modified main line shall have been established, or such connecting line located, the said Cedar Rapids and Missouri River Railroad Company shall file in the General Land Office of the United States a map definitely showing such modified line and such connecting branch as aforesaid, and the Secretary of the Interior shall reserve and cause to be certified and conveyed to said company, from time to time as the work progresses on the main line, out of any public lands now belonging to the United States not sold, reserved, or otherwise disposed of, . . . within fifteen miles of the original main line, an amount equal to that originally authorized."

It seems to us quite plain that, as in the original grant, no obligation on the Secretary to reserve any of this land from sale arises until the new line is established, that is, surveyed, approved by the directors, and filed in the General Land Office. Such is the language of the statute, and the reason for it is the same as in the original statute, that, as the number of sections the company would be entitled to could not be known until this was done and the length of the road ascertained, the Secretary could not know how much land it was necessary to reserve to satisfy the demand. Of course until this was done the sec-

·tions not included within the six-mile limit were open to sale and pre-emption. The time when it became the duty of the land officers to suspend these sales was under the control of the company, for whenever they established ·and filed in the General Land Office a·map *" definitely showing this modified line of their road,"* the duty of the Secretary arose, and not until then.

This was not done until December 1st, 1867, three years and a half after the passage of the act requiring it to be done, under which plaintiff's rights accrued. It is true a map of part of the line was filed in 1865, but this can·in no sense be said to be a map definitely showing the modified line of the road. It showed only a part of it, and left the Secretary in ignorance where the road would yet be carried to, and what quantity of land it would be entitled to when finished. In all these cases the requirement has been of a map of the *line of the road*—of the whole road, not part of it; a complete, not a partial, map; a map definitely showing that line, as the language clearly means.

It was during this delay of three years and a half that the entries were made under which defendants hold the land and acquired the legal title, except in a single instance, made January 4th, 1868, before any action of the Secretary could be had to withdraw the lands, and it was not until March 16th, 1876, that any of the lands in controversy were selected by the company; an average of ten years after the rights of defendants had vested. We are of opinion that the defendants had the right to do this in regard to any but the odd sections within the six-mile limit; that there was no contract between the United States and plaintiff which forbade it. No right existed in plaintiff to all these lands, or to any specific sections of them, during this period. No obligation of the government to withdraw them from sale arose until plaintiff filed a map, definitely showing the entire line of its road, in the General Land Office. The defendants purchased from officers who had the power to sell. They acquired a valid title.

If plaintiff has been injured it is by its own laches. If there is no land to satisfy its demand, it is because it delayed over

three years to file its map to establish the line of its road, and for years afterwards to make selections. It is unreasonable to say that during all that time these valuable lands were to be kept out of the market, when the country was rapidly filling up with an agricultural population, settling and making valuable farms on them.

*The judgments of the Supreme Court of Iowa are affirmed.*