THE IOWA FALLS & SIOUX CITY R'Y CO. v. BECK.

THE SAME v. FIELD, ADM'R.

THE SAME v. WENTWORTH ET AL.

THE SAME v. NICHOLS ET AL.

THE SAME v. NICHOLS.

THE SAME v. STONE.

1. **Railroad Lands:** GRANT TO DUBUQUE & PACIFIC RAILROAD COMPANY: WHEN TITLE PASSED. The title to the lands granted to the Dubuque & Pacific Railroad Company by act of congress, approved May 15, 1856, and by the act of the general assembly of the state of Iowa, approved July 15, 1856, did not pass to the company until the company had filed in the office of the governor a map or plat showing its route, and the governor had signed the same and filed it in the general land-office at Washington, as provided by section six of said last named act. It follows that lands within the six mile limit, which had been pre-empted prior to such filing, did not pass to the company or its successors.

2. ———: ———: HOMESTEAD TITLES ACQUIRED AFTER ADJUSTMENT OF RAILROAD CLAIMS. After the claims of the railroad under said grants had been finally adjusted, as it was supposed, lands which remained were thrown open to homestead entry. *Held* that the company could not defeat the titles procured under the homestead laws, on the ground that, after the supposed final adjustment, the title to a large amount of the lands included in said adjustment failed.

3. ———: ———: INDEMNITY LANDS: SELECTION NECESSARY. No claim can be maintained by the railroad company or its successors to lands as indemnity lands, unless they have first been selected as such, as provided in the act of congress relating thereto.

*Appeal from Woodbury District Court.*

WEDNESDAY, DECEMBER 9.

THESE causes involve substantially the same questions, and they were tried and submitted in this court upon one set of abstracts and arguments, and they were argued orally as one

case. The plaintiff and the several defendants present conflicting claims to certain lands in Woodbury county. The actions are in equity, and upon a final hearing in the district court a decree was entered dismissing the plaintiff's petitions, and adjudging the title to the lands to be in the defendants, as prayed in their respective counter-claims. The plaintiff appeals.

*Joy, Wright & Hudson*, for appellant.

*C. R. Marks* and *Geo. W. Wakefield*, for appellees.

ROTHROCK, J.—I. The plaintiff claims to be the owner of the real estate in controversy under the grant of lands made by act of congress approved May 15, 1856, and the act of the general assembly of the state of Iowa, approved July 15, 1856, accepting said grant and providing for carrying into execution the trust conferred upon the state of Iowa by said grant of lands by congress. It is claimed by the plaintiff that it is the successor in interest of the Dubuque & Pacific Railroad Company, the original corporation which was designated by said act of the general assembly as one of the beneficiaries under said congressional grant. That part of the record which shows the transfer of the rights of the Dubuque & Pacific Railroad company, and the acts of the general assembly of Iowa approving the same, and the change made in the different railroad organizations connected with the building of the road, need not be considered, as no question is made thereon, and the plaintiff will be regarded is this opinion as the legal successor in interest of the Dubuque & Pacific railroad Company.

That part of the act of congress, approved May 15, 1856, which is material to be considered in determining the questions involved, granted to the state of Iowa, for the purpose of constructing four railroads across the state from east to

*[margin note:]* J. RAILROAD lands: grant to Dubuque & Pacific railroad company: when title passed.

west, every alternate section of land designated by odd num-bers, for six sections in width on each side of each of said roads. The act provided that "in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said state, to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the rights of pre-emption have attached, as aforesaid; which lands (thus selected in lieu of those sold and, to which pre-emption rights have attached as aforesaid, together with the sections, and parts of sections designated by odd num-bers as aforesaid, and appropriated as aforesaid) shall be held by the state of Iowa for the use and purpose aforesaid: *pro-vided* that the land to be so located shall in no case be further than fifteen miles from the lines of said roads, and selected for and on account of each of said roads." It is pro-vided in another section of said act of congress "that the said lands hereby granted to the said state shall be subject to the disposal of the legislature thereof for the purposes aforesaid, and no other. &ast; &ast; &ast;

In pursuance of this grant, the general assembly of Iowa, in extra session in July, 1856, by an act approved on the fourteenth of that month, accepted the grant and disposed of said lands to four railroad corporations. By the fifth sec-tion of the act, all of the lands granted by congress to aid in building a railroad from the city of Dubuque to a point on the Missouri river, at or near Sioux City, were granted, dis-posed of and confirmed to the Dubuque & Pacific Railroad Company, of which, as has been said, the plaintiff herein is successor. That act further provided as follows: "Sec. 6.

The lines and routes of the several roads above described shall be definitely fixed and located on or before the first day of April next after the passage of this act, and maps or plats showing such lines or routes shall be filed in the office of the governor of the state of Iowa, and also in the office of the secretary of the state of Iowa. It shall be the duty of the governor, after affixing his official signature, to file such map in the department having the control of the public lands in Washington, such location being considered final only so far as to fix the limits and boundary in which said lands may be selected, and if it shall appear that the lands that have been donated by the act of congress aforesaid, for the construction of the several lines above indicated, cannot be obtained within the limits and along any part of the lines aforesaid, the governor shall from time to time appoint agents to make such selections as may be authorized or granted by congress for the lines aforesaid; but the compensation of such agents, and the costs, expenses and charges attendant upon and occasioned by making such selections, shall be fixed, regulated, paid and borne by each of said railroad companies, respectively, upon and for its own line."

The Dubuque & Pacific Railroad Company located their line of railroad over and past all of the land in controversy on the fifth day of July, 1856. When it is said the line was there located, it is meant that a corps of engineers ran a line and set stakes in the ground at certain distances from each other. This was done before the enactment of the law by which the state of Iowa accepted the grant and disposed of it to that company. The whole line was surveyed and staked off prior to August 31, 1856. The map was certified by the officers of the company September 26, 1856, and filed in the office of the governor of the state of Iowa on the second day of October, 1856. The governor signed and certified the map on the same day, and filed it in the general land-office October 13, 1856, with the proper certificates thereon. This was the information and *data* from which the officers of the

federal land department were enabled to proceed to an intelligent and accurate adjustment of the grant. The line thus fixed remained as the established line, and the railroad was afterwards constructed thereon.

The lands in controversy in all of these actions, except that in which Thomas J. Stone is defendant, are parts of odd sections within six miles of the line of road. The road actually runs through some three or four of these tracts. In all of these cases pre-emptions were filed by different parties upon the lands in controversy in the month of July, 1856, and in those against French and Wentworth the defendants claim directly through patents since issued, and which patents are based upon the original pre-emption filings. In the other cases the pre-emptions were perfected by final proof and entry, but the entries were afterwards canceled. All of the lands have been patented by the United States to the defendants or to their grantors. It was the policy of the general land-office to authorize pre-emptions up to October 13, 1856, and these entries were nearly all under the direct authority of the officers of the government who were charged with the duty of selling its lands and adjusting the grants. Afterwards there was a change of policy, and, under an opinion of the attorney-general of the United States, the pre-emptions made after the survey of the line were canceled. Some of the pre-emptors of these lands afterwards, upon application, procured the cancellations to be set aside. Soon after the passage of the act of congress, an agent was appointed by the state to aid in the adjustment of the grant. Lists were made of lands within the six-mile limits, which list designated the acreage of all the tracts; acreage of that sold or appropriated; acreage of that suspended for various causes; acreage of vacant lands passing under the grant; and acreage of interferences of a special character. These were what were called preliminary lists, and included all of the lands within the limits of the grant. From these lists the officers of the general land-office made up what were called approved

lists, which designated the lands that passed to the state under the grant; and, although the agents of the railroad company succeeded in procuring the cancellation of some of the entries, none of the lands in suit were ever put in the approved lists.

In April, 1863, the grant was adjusted and fully satisfied, as it was supposed. In this adjustment the lands in suit were not held to have passed under the grant; at least other lands were taken in lieu thereof and as indemnity for them. The plaintiff at no time after that, up to the time of commencing these actions, made any specific claim to these lands, and they were not then, and have never since been, certified to the state as having passed under the grant. If the adjustment made in April, 1863, had remained intact, no claim would have at any time been made by plaintiff for the land in suit, because the adjustment gave to the plaintiff the full amount of land granted by congress. This adjustment was made upon the theory that the grant previously made by congress to improve the Des Moines river did not include any lands north of the Raccoon fork of that stream. Afterwards, and in December, 1866, it was determined by the supreme court of the United States that the Des Moines river grant extended to the northern boundary of the state of Iowa. *Wolcott v. Des Moines Company,* 5 Wall., 681. By this decision more than 70,000 acres which were included in the adjustment of 1863 were awarded to the Des Moines River Company. The plaintiff, or those under whom it claims, then sought to return to an investigation of their rights, and to obtain other lands certified as part of the grant. Several years afterwards the railroad was built past and through the lands in controversy. The plaintiff then made no claim to these lands, but recognized the rights of some two or three of the defendants by causing a sheriff's jury to be selected to condemn the right of way for the railroad over the lands, which condemnation was made, and the damages awarded were paid by the plaintiff to the defendants. These condem-

nation proceedings were had in March, 1869, and, although subsequent lists of lands were made by agents of the plaintiff, and presented for certification, none of the lands involved in any of these suits were embraced therein. Most of these lands were improved farms when the railroad was built, with dwellings and other buildings in plain view of the road.

After the adjustment of 1863, and as late as 1866, the lands not included in the adjustment were again thrown open

2. ——: ——:
homestead ti-
tles acquired
after adjust-
ment of rail-
road claims.

to homestead entry, and some two or three of the defendants procured title under the homestead laws; and, although the evidence shows that the plaintiff and its predecessors in right had active, vigilant and efficient agents, who were familar with every act done in administering and settling the grant, from the time of its inception down to the commencement of these suits, the title to all of these lands was allowed to pass to the defendants, without objection or protest, so far as the public records show. It is insisted that the plaintiff, by its acts, is estopped from now asserting any claim to these lands. Whether the point is well taken or not, we need not determine. We may say, however, that if the plaintiff's acts do not amount to a technical estoppel, as defined in the law, they present in these actions what the law denominates as stale demands. But we think these cases may be disposed of upon another, and, as it appears to us, very satisfactory, ground. As has been stated, all of these lands within the limit of six miles were pre-empted in July, 1856. The map of the road was not prepared and filed for some time after that. The plaintiff claims that the title to the land passed to its predecessor or grantor when the line of road was surveyed and the stakes driven in the ground along the line. We think this position is not well taken, and that the title did not pass until the maps were filed in the general land-office, so that the officers of the government could intelligently and properly determine what land, as designated by section, township and range, passed under the grant. The act of con-

gress granted the land to the state, and the state accepted it and disposed of it to the plaintiffs' grantors. By the act of acceptance the railroad company was required to make the maps designating the line, and no other way was provided to ascertain the lands than by the map of the line of road. Appellant cites us to many cases which announce the doctrine that these grants were grants *in præsenti*, and that the right to the land was perfect upon the permanent location of the road upon the face of the earth. But many of the same cases include the filing of the maps as an act necessary to complete the permanent location. *Chicago, R. I. & P. R. Co. v. Grinnell*, 51 Iowa, 476; *Cedar Rapids & M. R. R. Co. v. Herring*, 110 U. S., 27; S. C., 3 Sup. Ct. Rep., 485.

We cannot adopt the views of the plaintiff that the right to these lands became fixed and absolute by the driving of stakes in the month of July, and that the seeker of a home upon wild lands was bound to trace a line of stakes in the grass, and determine at his peril that he was not trespassing upon land that had been selected under a railroad grant. The act of the general assembly of Iowa plainly prescribes the steps necessary to be taken by the railroad companies to entitle them to the benefit of the grant, and these acts require more than the mere survey of a line and driving stakes in the ground. This was the construction which was put upon the law by the commissioner of the general land-office at the time. Pre-emptions were allowed to be made up to the date of the filing of the map. The lands did not pass by the grant, because "the right of pre-emption had attached to the same before the line of the road was definitely fixed. It is true that these pre-emptions were afterwards canceled by the procurement of the railroad company, upon the alleged ground that they were in conflict with the railroad grant. We have seen that there was no conflict, and that, so far as the rights of the railroad company were involved, they were valid pre-emptions. Some claim is made that the entries were fraudulent. There might, possibly, be merit in the

claim if the cancellations had been made upon this ground. But we repeat that they were held invalid upon the sole ground that they were in conflict with the railroad grant. They were wrongfully canceled, and the plaintiff's predecessor or grantor acquired no right by the cancellation. As we have seen, some of the entries were reinstated and the land patented to the defendants. In the others the land was thrown open in 1866 for homesteads, and, never having passed to the plaintiff under the grant, it was rightfully patented to the defendants under the homestead law.

II.   The land patented to the defendant Thomas J. Stone is not within the limit of six miles. It is between the six

*3. ———: ———: indemnity lands: selection necessary.* and fifteen mile limit, and if plaintiff ever had any claim thereto it was what is called indemnity or lieu lands, to be selected by the railroad company to indemnify it for such of the lands in the odd sections within the six-mile limits as has been disposed of, or to which pre-emption rights had attached. It is enough to say, with reference to this land, that it has never been claimed or selected by the plaintiff as indemnity land. That a selection of the indemnity land claimed is necessary is no longer an open question.  *Ryan v. Railroad Co.*, 99 U. S., 382; *Grinnell v. Railroad Co.*, 103 U. S., 742; *Cedar Rapids & M. R. R. Co. v. Herring*, 110 U. S., 27; S. C., 3 Sup. Ct. Rep., 485.

In *Stone's Case* a pre-emption was filed on the land March 1, 1856, and remained uncanceled on the books of the land-office October 13, 1856. It is probable that this was the reason that the land was never claimed as indemnity, and that with other unclaimed lands it was put upon the market in 1866 and sold to Stone.

In our opinion the decree of the district court is correct, and it is therefore

AFFIRMED.