# SOUTHERN PACIFIC RAILROAD COMPANY *v.* BELL.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 20.   Argued and submitted December 5, 6, 1901.—Decided January 13, 1902.

The Atlantic and Pacific Railroad Company took no title to lands within the indemnity limits of its grant until the deficiency in the place limits had been ascertained, and the company had exercised its right of selection.

The Secretary of the Interior had no authority, upon the filing of a plat in the office of the Commissioner of the General Land Office, to withdraw lands lying within the indemnity limits of the grant from sale or preemption; and a patent issued to a settler under the land laws, prior to the selection made by the railroad company, of the land in dispute as lieu lands, was held to be valid, notwithstanding the lands lay within the forty-mile strip ordered by the act to be surveyed, after the general route of the road had been fixed.

The case of *Hewitt* v. *Schultz*, 180 U. S. 139, followed and applied to the facts of this case.

THIS was a complaint in the nature of a bill in equity filed by the Southern Pacific Railroad Company in the Superior Court of Fresno County, California, against Isaac T. Bell, praying to be declared the rightful owner of a certain quarter section of land in that county, and that it be adjudged that the defendant Bell holds the legal title to said land in trust for the plaintiff, and requiring him to convey the same to it free of all encumbrances.

The facts of the case, as set forth in the complaint, are substantially as follows: By "An act granting lands to aid in the construction of a railroad and telegraph line from the States of Missouri and Arkansas to the Pacific Coast," act of July 27, 1866, c. 278, 14 Stat. 292, such road being incorporated under the name of The Atlantic and Pacific Railroad Company, there was granted to such railroad company—

"SEC. 3. . . . Every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side

of said railroad whenever it passes through any State, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption, or claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the Commissioner of the General Land Office; and whenever prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved or occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections," etc.

"Sec. 6. And be it further enacted, That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry or preemption, before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and the Act entitled 'an act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road when surveyed, excepting those thereby granted to said company."

By section 18 of the same act authority was given to the Southern Pacific Railroad Company, incorporated under the laws of California, "to connect with the said Atlantic and Pacific Railroad, formed under this act, at such point near the boundary line of the State of California, as they shall deem most suitable for a railroad line to San Francisco, and shall have a uniform gauge and rate of fare with said road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its

road on like regulations, as to time and manner, with the Atlantic and Pacific Railroad herein provided for."

On November 26, 1866, the plaintiff accepted the terms and conditions of the charter and grant of July 27, 1866, as above set forth, and on January 3, 1867, duly fixed the general route of its line of road, designating the same by a plat thereof filed in the office of the Commissioner of the General Land Office. This plat and designation having been duly approved and accepted by the Commissioner and Secretary of the Interior on March 22, 1867, all the odd-numbered sections of land lying within thirty miles of the railroad, as shown upon the plat, were withdrawn from sale or location, preëmption or homestead entry, and have ever since remained so withdrawn.

Thereafter, and prior to November 8, 1889, the company duly constructed and equipped the entire railroad provided for in said act, and along the line designated upon the plat filed on January 3, 1867, and the road so constructed, except that part which extends from Mojave to the Needles, was duly accepted and approved by the President and Secretary of the Interior.

A certain quarter section of land within the granted limits of the railroad, as constructed and shown on the map, having been granted and otherwise disposed of, prior to the time when the line of the route was designated by the plat filed with the Commissioner of the General Land Office, the quarter section of land in dispute in this case, which was within the indemnity, but not within the granted limits of the road, being more than twenty but within thirty miles on one side of the road as constructed, was selected by the railroad, in lieu of the quarter section above described as having been granted and otherwise disposed of by the United States. The land so selected was at the time the act of July 27, 1866, was passed, vacant and unappropriated public land of the United States, not mineral, to which the United States then had full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, and such land has ever since so remained, except as it has been affected by the acts of the parties to this suit. The company had not, at the time the selection was made, nor has it since, selected or re-

ceived lands to the extent or amount earned and acquired by it in virtue of the grant and the provisions of the granting act.

The complaint further alleged that notwithstanding the rights of the company secured to it by the act of July 27, 1866, the United States issued a patent for the quarter section so selected in lieu of the other, to the defendant, who claims the legal title to said land in fee simple and free from any trust or obligation to the plaintiff.

To this complaint the defendant interposed a general demurrer, which was sustained, and the plaintiff having refused to amend his complaint, a final judgment was entered against it and an appeal taken to the Supreme Court of California, where the judgment of the Superior Court of Fresno County was affirmed upon the authority of another case against one Wood. 124 California, 475. Whereupon plaintiff sued out a writ of error from this court.

*Mr. Maxwell Evarts* for the Southern Pacific Railroad Company. *Mr. L. E. Payson* was on his brief.

*Mr. Joseph H. Call* for Bell, submitted on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case involves a priority of right to certain lands within the indemnity limits of the grant to plaintiff by act of Congress of July 27, 1866, as against a patent for the same lands issued to the defendant as a settler under the land laws of the United States.

It presents the single question whether the railroad company had a right, on July 26, 1893, to select the land in dispute as lieu lands, notwithstanding the defendant had nearly one year before and on September 15, 1892, received a patent for the same. This involves the further question whether the lands in dispute were subject to preëmption and sale after the filing of the plat designating the line of the road; and this turns upon the meaning of the words, "land hereby granted," used in sec-

tion 6, wherein it is enacted that the "odd sections of land *hereby granted* shall *not* be liable to sale or entry or preëmption, before or after they are surveyed, except by said company, as provided in this act," which language must also be construed in connection with the further proviso in the same section, that the preëmption act of 1841, the homestead act of 1862, and the acts amendatory thereof, "shall be and the same are hereby extended to all *other* lands on the line of said road when surveyed, excepting those *hereby granted* to said company."

There is no dispute that the land "hereby granted" extends to all the odd-numbered sections within the place limits; that is, within twenty miles of each side of the road. The real question is whether it extends to the indemnity lands, ten miles beyond this limit, so much of which the company was authorized to select in lieu of lands unavailable to it within the granted limits.

The relative rights of railroads and of settlers under these Congressional grants, all of which are couched in similar language, have been the subject of much litigation in this court, the main object of which has been to fix the time when the right of the roads to particular lands within both the place limits and the indemnity limits finally attaches as against both prior and subsequent settlers. Although at the last term of this court the question involved in the case under consideration was practically settled in *Hewitt* v. *Schultz*, 180 U. S. 139, the progressive steps by which the conclusion in that case was reached will show the difficulties which have attended the solution of these questions, and, as we think, indicate the logical necessity of affirming this case. Two objects have been kept steadily in view: First, securing to the railroad the benefit of the lands actually granted; second, protecting, as far as possible, the right of the public to lands not actually granted, or necessary to indemnify the roads for lands which have become unavailable to it within its granted limits, by reason of the fact that they had been otherwise disposed of prior to the designation of the line of the road.

In the first of these cases, *Schulenberg* v. *Harriman*, 21 Wall. 44, it was held that the act of June 3, 1856, granting lands to

the State of Wisconsin, to aid in the construction of railroads, was a grant *in præsenti* of lands within the granted limits, and passed the title to the odd sections designated to be afterwards located; but, until such designation, the title did not attach to any specific tracts, and that when the route was fixed the title which was previously imperfect acquired precision, and became attached to the lands as of the date of the grant. There was no question of indemnity lands involved.

In *Leavenworth &c. Railroad Co.* v. *United States,* 92 U. S. 733, it was held that a similar grant, though operating *in præsenti,* did not apply to lands set apart for the use of an Indian tribe under a treaty, and that it was immaterial that they subsequently became a part of the public lands by the extinguishment of the Indian rights. This doctrine was extended in the next case, *Newhall* v. *Sanger,* 92 U. S. 761, to lands within the boundaries of an alleged Mexican or Spanish grant, which was *sub judice* at the time the Secretary of the Interior ordered a withdrawal of lands along the route of the road.

In *Ryan* v. *Railroad Company,* 99 U. S. 382, the rule laid down in the last two cases was qualified and limited to lands within the place limits, and it was held that, as the lands in *Ryan* v. *Railroad Company* were within the indemnity, but not within the place limits, ". the railroad company had not and could not have any claim to it until specially selected." The land in dispute was within a tract formerly covered by a Mexican claim, which, although *sub judice* at the date of the act, had been finally rejected as invalid before the railroad company had selected it as part of its lieu lands. When so selected "there was no Mexican or other claim impending over it." This case practically holds that the title to indemnity lands inures to the railroad company only when selection is made.

This view, that the act conferred no rights to specified tracts within the indemnity limits until the grantees' right of selection had been exercised, was subsequently confirmed in *Cedar Rapids &c. Railroad Co.* v. *Herring,* 110 U. S. 27, and *Kansas Pacific* v. *Atchison &c. Railroad,* 112 U. S. 414, although it had been stated only as a suggestion in *Grinnell* v. *Railroad Company,* 103 U. S. 739.

In *Van Wyck* v. *Knevals*, 106 U. S. 360, it was again held that the grant of the place lands was *in præsenti*, and attached to the sections as soon as a map showing the definite location of the road was filed, and that a party who had subsequently entered a portion of the land covered by the grant, and procured a patent for the same, might be required to execute a release of the premises to the company. It was said by Mr. Justice Field, in that case, (p. 365,) that the grant cut off all subsequent claims from the date of this act, with certain exceptions specifically named, and passed the title as fully as if they had been then capable of identification.

The principle of this case was still further applied in *St. Paul & Sioux City Railroad* v. *Winona & St. Peter Railroad*, 112 U. S. 720, to two conflicting grants, and it was held that as the title to the lands was within the place limits, it related back, after the road was located, to the date of the grant, priority of date of the act of Congress, and not priority of location of the line of the road, giving priority of title. A distinction was drawn in this case between the land within the place limits and land within the indemnity limits and it was said that in case of the latter neither priority of grant, nor priority of location, nor priority of construction gave priority of right; but this was determined by priority of selection.

The case of *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55, is in seeming conflict with *Leavenworth &c. Railroad Co.* v. *United States*, 92 U. S. 733, inasmuch as it was held that the grant by act of July 2, 1864, to the Northern Pacific Railroad, of lands to which the Indian title had not been extinguished, operated to convey the fee to the company subject to the right of occupancy by the Indians; but the case is distinguishable, as there was in the second section of the act a proviso that the United States " should extinguish, as rapidly as might be consistent with public policy and the welfare of the Indians, their title to all lands falling under the operation of this act, and acquired in the donation to the road." The prior case was not cited in the opinion.

The conclusions to be deduced from these cases are—

(1) That as to lands within the primary limits, the grant

takes immediate effect, and attaches to particular lands when the map of definite location is filed; that the Secretary of the Interior may, upon the filing of such map, give notice of a withdrawal from sale of all the odd-numbered sections within the granted limits, and that the title so acquired by the railroad company relates back to the date of the grant and takes precedence of all titles subsequently acquired, except those specifically named.

(2) That to lands within the indemnity limits, the company takes no title until a deficiency in the place limits has been ascertained and the company has exercised its right of selection, with perhaps some rare exceptions. See *St. Paul & Pacific* v. *Northern Pacific*, 139 U. S. 1.

The last case upon this subject is *Hewitt* v. *Schultz*, 180 U. S. 139, which involved the title to a quarter section of land in North Dakota within the indemnity limits, that is (as applied to Territories), between the forty and fifty-mile limits of the Northern Pacific Railroad land grant. Plaintiff Hewitt claimed title as a settler under the preëmption laws; defendant as a purchaser from the railroad company, under its grant of July 2, 1864, c. 217, 13 Stat. 365. The third and sixth sections of this act were, except as to the name of the railroad and a few immaterial words, identical with the corresponding sections of the Atlantic and Pacific act of July, 1866.

On March 30, 1872, the railroad company filed a map of its general route through the Territory of Dakota, and the local land office was thereupon directed to withhold from sale or location all the odd-numbered sections within the place limits of *forty* miles, as designated on such map. On June 11, 1873, the company having filed a map of the definite location of its line, the local land office was directed to withhold from sale, or entry, all the odd-numbered sections within the *fifty*-mile limits. This action was taken pursuant to the practice at that time prevailing in the General Land Office.

The land in dispute was more than forty, but within fifty, miles of the line of definite location; that is, was within the indemnity limits, and the controlling question in the case was whether it was competent for the Secretary of the Interior to withdraw

the odd-numbered sections within such indemnity limits; that is, between the forty and fifty-mile limits.

Hewitt settled upon the land April 10, 1882, more than a year before the withdrawal was made, and it was not until March 19, 1883, that the railroad company filed in the local land office its selection of land, embracing the land in dispute within the indemnity limits.

On April 4, 1883, Hewitt submitted his final proofs for the land, tendered the price, and demanded a patent; but his proof was rejected on the ground that the land had been withdrawn from entry under the act of July 2, 1864. Hewitt appealed to the Commissioner of the General Land Office, who affirmed the decision of the local land office, October 5, 1883. He was ousted of his possession the following year by the defendant Schultz, who had taken a deed from the railroad company. On August 15 1887, the order of withdrawal of the indemnity lands was revoked, and upon a review by the Commissioner of the General Land Office of his former decision, the ruling of the local land office was set aside, Hewitt's final proofs admitted, and the selection by the railroad held for cancellation. The company appealed from the decision in favor of Hewitt to the Secretary of the Interior, who affirmed the decision of the Commissioner, and a patent was issued to Hewitt, June 22, 1895.

It was contended upon the argument in this court that the words "the odd sections of land *hereby granted*," used in the sixth section, referred to the lands described in the "first" (third) section of the act; that is, to those within the place limits, which were free from preëmption and other claims, and unappropriated prior to the definite location of the road; and that, as to, "all other lands on the line of said road, when surveyed," the act expressly declared that the preëmption and homestead acts should extend to them; "that Congress took pains to declare that it did not exclude from the operation of those statutes any lands except those granted to the company in the place limits of the road which were unappropriated when the line of the railroad was definitely fixed; and that if at the time such line was 'definitely fixed,' it appeared that any of the lands granted, that is, lands in the place limits, had been sold, granted

or otherwise appropriated, then, but not before, the company was entitled to go into the indemnity limits beyond the forty-mile and within the fifty-mile line, and under the direction of the Secretary of the Interior, and not otherwise, select odd-numbered sections to the extent necessary to supply the loss in the place limits."

The court, treating the question as one of grave doubt, based its views largely upon the practice of the Land Office since 1888, and of the opinions of Secretary Lamar in the *Atlantic & Pacific Railroad*, 6 Land Dec. 84, and of Secretary Vilas in *Northern Pacific Railroad* v. *Miller*, 7 Land Dec. 100. The opinion of Secretary Lamar indicated that some of his predecessors had assumed that the power to withdraw lands within the indemnity limits could be exercised upon a definite location of the railroad before the loss in the place limits had been ascertained, but treating it as an original proposition, he thought the words of the act, " that the odd-numbered sections of land *hereby granted* shall not be liable to sale, or entry, or preëmption," indicated clearly the legislative will that none other should be withdrawn than the odd-numbered sections within the *granted* limits. Mr. Secretary Vilas, considering the same subject, said: " In my opinion, and it is with great deference that I present it, the granting act not only did not authorize a withdrawal of lands in the indemnity limits, but forbade it. The difference between lands in the granted limits and land in indemnity limits, and between the time and manner in which the title of the United States changes to and vests in the grantee, accordingly as lands are within one or the other of these limits, has been clearly defined by the Supreme Court, and it is sufficient to state the well-settled rules upon this subject."

The same question arose in *Northern Pacific Railroad* v. *Davis*, 19 Land Dec. 87, and in *Northern Pacific Railroad* v. *Ayers*, wherein Secretaries Smith and Francis expressed their concurrence in the views announced by Secretaries Lamar and Vilas.

The court rested its decision largely upon this concurrence of views and long continued practice of the Land Department, and summed up its opinion in the following words: " If this were

done," (that construction overthrown,) "it is to be apprehended that great if not endless confusion would ensue in the administration of the public lands, and that the rights of a vast number of people who have acquired under the preëmption and homestead laws, in reliance upon the ruling of Secretary Vilas and his successors in office, would be destroyed. . . . If the practice in the Land Department could, with reason, be held to be wrong, it cannot be said to have been so plainly or palpably wrong as to justify the court, after the lapse of so many years, in adjudging that it had misconstrued the act of July 2, 1864."

It is attempted to distinguish the case under consideration from that of *Hewitt* v. *Schultz*, by the fact that the land in controversy in this case is within the indemnity limits of a grant to a railroad passing through a *State*, and within the department's withdrawal of a thirty-mile strip under the sixth section of the act, while the land in the *Hewitt* case fell within the indemnity limits of the grant within a *Territory*, and was beyond the forty-mile withdrawal, and was not withdrawn from sale by the sixth section, but was expressly declared to be still subject to the operations of the preëmption laws. It is true that the lands withdrawn in that case lay within a Territory and outside of the forty-mile strip required to be surveyed, while in this case the withdrawal of all the lands within the thirty-mile strip operates as a withdrawal of all lands within the indemnity, as well as within the place limits, because the line ran through a State instead of a Territory. But the real question is not whether the indemnity lands lay within or beyond the forty-mile limit, but whether the withdrawal can operate upon indemnity lands at all. It makes no difference in principle whether the indemnity lands are within or beyond the forty-mile limit, which is not a limit of withdrawal but of *survey*, and the whole argument in *Hewitt* v. *Schultz* is directed to the question whether it is within the power of a Secretary of the Interior to withdraw indemnity as well as place lands from settlement. The quantity of lands to be surveyed seems to have been arbitrarily fixed by Congress, with little attention to the actual limits of the grant, so as to include all lands within forty miles of each side of the railroads, that is, ten miles beyond the indemnity limits within the States, but

ten miles inside of those limits within the Territories; but the question of withdrawal is not necessarily dependent upon the question of survey, and the fact that in that case the indemnity lands were beyond the forty-mile limit was an incident rather than a dominant fact. As said by Mr. Secretary Lamar: "It is manifest that the said act gave no especial authority or direction to the executive to withdraw said lands, and when such withdrawal was made it was done by virtue of the general authority over such matters possessed by the Secretary of the Interior and in the exercise of his discretion." The power of the Secretary to withdraw lands is exercised for the purpose of carrying out the grant to the railroad, and to prevent lands covered by said grant from being taken up by settlers before the road is completed and the patents issued to the company; but clearly that power cannot be exercised to withdraw lands which are beyond the intended limits of the grant. It was said by Secretary Smith to have been exercised for many years, "but the right of this asserted power on the part of the executive is involved in obscurity." *Northern Pacific R. R.* v. *Davis,* 19 Land Dec. 87, 88.

That the object of section six was to direct a survey and not a withdrawal of lands within the forty-mile strip, seems to have been the opinion of this court in *St. Paul Railroad* v. *Winona Railroad,* 112 U. S. 720, in which Mr. Justice Miller, delivering the opinion says, (p. 732):

"The plaintiff in error insists that the map of its line of road was filed in 1859. The court of original jurisdiction finds that, up to the time of the trial in October, 1878, a period of nearly twenty years, no selection of these lands had ever been made by that company, or any one for it. Was there a vested right in this company, during all this time, to have not only these lands, but all the other odd sections within the twenty-mile limits on each side of the line of the road, await its pleasure? Had the settlers in that populous region no right to buy of the government because the company might choose to take them, or might, after all this delay, find out that they were necessary to make up deficiencies in other quarters? How long were such lands to be withheld from market and withdrawn from taxation, and forbidden to cultivation?

" It is true that in some cases the statute requires the Land Department to withdraw the lands within these secondary limits from the market, and in others the officers do so voluntarily. This, however, is to give the company a reasonable time to ascertain their deficiencies and make their selections.

" It by no means implies a vested right in said company, inconsistent with the right of the government to sell, or of any other company to select, which has the same right of selection within those limits. Each company having this right of selection in such case, and having no other right, is bound to exercise that right with reasonable diligence; and when it is exercised in accordance with the statute, it becomes entitled to the lands so selected."

If the command of the statute were to withdraw from the market, instead of survey, all odd-numbered sections within the forty-mile strip, the position of the railroad company in this case would be impregnable; but as the withdrawal only extends to the lands " hereby granted," we must look elsewhere to ascertain the meaning of those precise words. There is good reason for withdrawing lands within the place limits, since these lands already belong to the railroad company, as soon as they are identified by the location of the line, while lands within the indemnity limits may never be required at all, and in most cases are required only to a limited extent. Undoubtedly the company acquires title to both classes of lands by the third section of the granting act; but it acquires a title to lands within the place limits by a present grant while to land within the indemnity limits, only by a future power of selection. In both cases the statute is the origin of the title; but in the one case it gives instantaneously; in the other it is a mere promise to give in the future, and requires the action of the railroad to perfect it. The words " hereby granted" evidently refer to the former.

Treating this case as a reargument of the question involved in *Hewitt* v. *Schultz*, and it practically comes to that, we still adhere to the principle there announced. It seems to us the more reasonable, if not the necessary, inference to be deduced from the language of sections 3 and 6. By the former there is

"*hereby granted* . . . every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State." These words terminate the grant, the remainder of the clause being immaterial in this connection, and if the whole clause had been followed by a period, instead of a semicolon, the meaning, perhaps, would have been clearer. But there follows another clause, that " whenever, prior to said time, any of said sections, or parts of sections, shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be *selected* by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections," etc. There is here a clear distinction between the lands *granted in præsenti* in the first clause, and lands to be thereafter *selected* by the company, whenever the deficiency in the granted lands shall be ascertained.

The sixth section carries out the same idea. It requires a survey of forty miles in width on both sides of the entire line, whether passing through States or Territories. This would include only the granted or place limits within a Territory, but within a State would cover the indemnity limits as well. There was no order in the act to withdraw any lands from settlement or sale, but such withdrawal seems to have been made in pursuance of the practice of the Interior Department, and for the purpose of preventing lands granted to the railroad company from being taken up by settlers, before the completion of the line and the final issue of patents. As was said by Mr. Secretary Lamar in the *Atlantic & Pacific Railroad Company,* 6 Land Dec. 84, 88 : " Waiving all questions as to whether or not said granting act took from the Secretary all authority to withdraw said indemnity limits from settlement, it is manifest that the said act gave no special authority or direction to the executive to withdraw said lands ; and when such withdrawal was

made it was made by virtue of the general authority over such matters possessed by the Secretary of the Interior, and in the exercise of his discretion; so that, were the withdrawal to be revoked, no law would be violated, no contract broken." But as the power to withdraw extends only to the "*lands hereby granted*" and all other lands, except those hereby granted, remain open to settlement, we are thrown back upon section 3 to determine what are the lands "hereby granted."

Now, as already observed, there is a clear distinction in section 3 between granted lands and lands to be selected after the deficiency in the granted lands has been ascertained. It is true that, prior to this selection being made, many of these indemnity lands may be taken up, and an insufficient amount left for the railroad, (and we do not deny the force of the dissenting opinion in *Hewitt* v. *Shultz* in that connection,) but we think this possibility serves rather as a basis for a further action by Congress, such as was made in the Northern Pacific case by the joint resolution of May 31, 1870, (16 Stat. 378,) than as a reason for withdrawing from settlement a vast amount of land which the railroad may never have occasion to require. It was said by Secretary Lamar in the case of the *Atlantic & Pacific Railroad Co*, 6 Land Dec. 84, 87: "As to the lands within the indemnity limits, the contract was based upon two contingencies; that of losing lands within the granted limits, and being able to find sufficient to indemify the company among the odd-numbered sections within a further limit of ten miles. Here the interest of the company was so remote and contingent, being a mere potentiality, and not a grant, that Congress declined to order a withdrawal for the benefit of the same, or even a survey within the Territories." In view of the constant trend of population toward the Western Territories, it is a serious matter to withdraw these enormous tracts from settlement and hold them, as it were, in mortmain against the protest of those who stand ready to enter upon and possess them.

It becomes still more serious when, as in this case, there was a delay of twenty-seven years between the granting act and the act of selection. It seems intolerable that a settler, who had entered and paid for lands in good faith, should be liable to an

ouster after a possible lapse of twenty-seven years, when the very improvements he may have put upon the lands might be the reason for their selection by the company.

We are therefore of opinion that the act of July 27, 1866, did not authorize the withdrawal by the Secretary of the Interior of the indemnity lands; that such lands remained open to homestead and preëmption entry, and that patents issued to settlers within such indemnity limits, based upon the entries made prior to the selection by the railroad company, approved by the Interior Department, were valid as conveyances of the land as against the selection by the railroad company.

The judgment of the Supreme Court of California is, therefore,

*Affirmed.*