260 F.2d 900
 Keith C. MORTON, Appellant,
v.
NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellee.
Robert E. KUNTZ, Appellant,
v.
NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellee.
Gene A. PICOFIC, Appellant,
v.
NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellee.
John S. MAHAN, Appellant,
v.
NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellee.
 Nos. 15516-15519.
 United States Court of Appeals Ninth Circuit.
 October 6, 1958.
 
 Ralph J. Anderson, Stanley P. Sorenson, Helena, Mont., J. R. Vaughan, Los Angeles, Cal., for appellant.
 Coleman, Lamey & Crowley, Cale Crowley, Robert P. Davidson, Billings, Mont., M. L. Countryman, Jr., St. Paul, Minn., for appellee.
 Before DENMAN, POPE and HAMLEY, Circuit Judges.
 POPE, Circuit Judge.
 
 
 1
 These are four appeals from identical orders dismissing actions originally brought by the appellants against the Northern Pacific Railway Company in the State court and which were removed on that company's petition to the above named United States District Court.[1] The order for dismissal was based upon the court's determination that the allegations of the appellants' pleadings disclose that they were entitled to no relief.
 
 
 2
 Each appellant alleged that he presented to the appellee a written application to purchase, for purposes of settlement, a certain quarter section of land situated in McCone County, Montana, and within the area of the second indemnity limits defined in the Congressional Joint Resolution of May 31, 1870, 16 Stat. 378, relating to the so-called Northern Pacific Land Grant.
 
 
 3
 Each appellant alleged that he possessed all of the qualifications required for settlement under the land and homestead laws of the United States, including such qualifications as he had as a veteran of World War II; that although each appellant tendered to the appellee a sum equal to $2.50 per acre for the lands he sought to purchase, the application was rejected and refused by the appellee; that appellant was entitled to make such purchase by reason of the provisions of the Joint Resolution of 1870, above referred to, under which the lands so sought had been selected by and patented to the appellee Railway Company or its predecessors. The particular portion of said Joint Resolution of 1870 which the appellants asserted gave them the right to purchase the lands was a proviso reading in part as follows: "Provided, that all lands hereby granted to said company which shall not be sold or disposed of or remain subject to the mortgage by this act authorized, at the expiration of five years after the completion of the entire road, shall be subject to settlement and preemption like other lands, at a price to be paid to said company not exceeding two dollars and fifty cents per acre * * *"
 
 
 4
 Briefly stated the position of the appellants was that what enabled appellee to acquire title to these indemnity lands was the enactment of the Joint Resolution. Hence, said appellants, these were lands "hereby granted" within the meaning of the quoted proviso, and they were subject to acquisition for settlement at the price stated because the five years had long since expired.[2]
 
 
 5
 In dismissing the appellants' actions the trial court held that the lands here in question could not be considered as lands "hereby granted" within the meaning of the quoted proviso. The court said "it seems to have been clearly established that the Joint Resolution granted no lands in Montana." In so holding the court relied primarily upon the cases of Hewitt v. Schultz, 180 U.S. 139, 21 S.Ct. 309, 45 L.Ed. 463, and Southern Pacific R. Co. v. Bell, 183 U.S. 675, 22 S.Ct. 232, 46 L.Ed. 383.
 
 
 6
 In the case of Hewitt, the Secretary of the Interior, upon receiving and approving a map of the definite location of the Northern Pacific Railroad in North Dakota, withdrew from entry odd numbered sections of the land within the indemnity limits. Thereafter Hewitt made entry and settlement under the general land laws upon a portion of the lands so withdrawn and tendered the required price with his final proof of compliance with the applicable act. His proof was rejected on the ground that the land had been withdrawn from entry under the act granting lands to the Northern Pacific Railroad Company. While Hewitt was in possession, Schultz entered into a contract with the Railroad for the purchase of the same land which the Railroad selected, and Schultz ousted Hewitt from possession. Thereafter the decision of the local Land Office against Hewitt was reversed and set aside, his final proof admitted, and the selection by the railroad was held for cancellation. Hewitt sought ejectment against Schultz and the question for decision by the court was whether the act in question authorized the withdrawal of lands in the indemnity limits which had been made at the time of the definite location.
 
 
 7
 The court approved and accepted the construction of the Northern Pacific act previously made by the Secretary of the Interior that the act forbade the Land Department to withdraw lands within the indemnity limits of the grant; it held that until a valid selection was made by the Railroad from lands within the indemnity limits they were open to disposition or appropriation under the homestead and pre-emption laws of the United States, and hence that Hewitt's entry and settlement entitled him to the land.
 
 
 8
 The court quoted the following from the Secretary's decision (180 U.S. at page 151-152, 21 S.Ct. at page 313): "As to the lands in the primary, or granted, limits: `The title to the alternate sections to be taken within the limits, when all the odd sections are granted, becomes fixed, ascertained, and perfected in each case by this location of the line of road, and in case of each road the title relates back to the act of Congress.' * * * As to indemnity limits: `The time when the right to lands becomes vested, which are to be selected within given limits under these land grants, whether the selection is in lieu of lands deficient within the primary limits of the grant or of lands which for other reasons are to be selected within certain secondary limits, is different in regard to those that are ascertained within the primary limits by the location of the line of the road. * * The consequence of this difference is that, until a valid selection by the grantee is made from the lands within the indemnity limits, they are entirely open to disposition by the United States, or to appropriation under the laws of the United States for the disposition of the public lands." It accepted this statement of the meaning of the Northern Pacific Railroad grants and held that the order of withdrawal, which included the Hewitt lands, was improper; hence there was "no legal ground to question the title of the plaintiff to the land in dispute."
 
 
 9
 The Supreme Court made it plain that the section of the Act of July 2, 1864 which had the most material bearing upon its decision was § 6. That section, quoted with the same emphasis that appears in the decision, is copied in the margin.[3] The Court noted that the argument which it accepted was predicated upon the distinction between the sections of land referred to in the clause containing the italicized words "hereby granted" and the later provision that the preemption and homestead provisions are extended to "all other lands on the line of said road."
 
 
 10
 The Hewitt case was followed in the Southern Pacific R. Co. v. Bell, supra, case, which dealt with substantially identical language in another railroad land grant. In that case the court said: (183 U.S. at page 687, 22 S.Ct. at page 237) "Undoubtedly the company acquires title to both classes of lands by the 3d section of the granting act; but it acquires a title to lands within the place limits by a present grant; but to land within the indemnity limits, only by a future power of selection. In both cases the statute is the origin of the title; but in the one case it gives instantaneously; in the other it is a mere promise to give in the future, and requires the action of the railroad to perfect it. The words `hereby granted' evidently refer to the former."
 
 
 11
 After noting these two decisions of the Supreme Court, the court below accepted as entirely pertinent the inquiry of appellee's counsel: "How can the applicants seriously urge that by the foregoing language Congress was making a grant of land in the second indemnity strip in Montana?"
 
 
 12
 Of course the quoted query is not precisely pertinent because in those two cases the Supreme Court was not dealing with the language of the proviso of the Joint Resolution of May 31, 1870. It was dealing with the appropriate construction of the language used in §§ 3 and 6 of the original act of July 2, 1864. It is true that the key words "hereby granted" appear both in § 6 and in the proviso of the Joint Resolution. The decisions in the Hewitt and the Bell cases are not without some persuasive force. But some cogent arguments have been presented by the appellants to the effect that neither the Hewitt nor the Bell case is in point here. As stated here, the Hewitt case dealt only with § 6 of the earlier act, the main question being — which lands were granted in praesenti? The holding was that the indemnity lands were not so granted. Primarily the problem was:- when did the title pass? Because title to the indemnity lands did not pass as of the definite location of the road, it was there held that the withdrawal at that time was unauthorized.
 
 
 13
 It must be recognized that the words "hereby granted" in the proviso of the Joint Resolution of 1870 do not necessarily have the same meaning as the same words which appear in § 6 of the grant of 1864. The precise problem presented here is not controlled by the decisions in the Hewitt and Bell cases; it is one which has not previously been decided. Some suggestion is made that what is known as the Land Grant Case of 1940, United States v. Northern Pacific Ry. Co., supra, passed upon this question. An examination of that case discloses that in dealing with the proviso, the Court did no more than hold that it did not apply retroactively to the lands acquired under the grant of 1864. In this respect the court said (311 U.S. at page 368, 61 S.Ct. at page 287): "We hold, contrary to the Government's assertion, that the proviso of the Resolution of 1870, requiring that the lands be opened by the company to settlement and preemption, applies only to the additional lands granted by that Resolution and not to lands acquired under the grant of 1864."[4] Nor does the decision of this court in Russell v. Texas Company, 9 Cir., 238 F.2d 636, assist us here for the question there was simply whether the proviso of the 1870 Resolution applied to place lands of the Railroad within the State of Montana which were granted by the Act of July 2, 1864. That case did not involve lands located within the second indemnity belt provided by the 1870 Resolution.
 
 
 14
 Appellants call our attention to the fact that in this case, in contrast with the Hewitt case, the Northern Pacific Railway has long since acquired title to these second indemnity lands which the appellants seek to purchase. It is of no significance to the decision of the present case when the Company acquired title to these lands. In the Hewitt and Bell cases the problem of "when" was basic to the decition. Furthermore, it is noted that had the Resolution of 1870 not been enacted, the appellee could never have acquired title to these lands in Montana within the second indemnity belt. In that sense the Resolution of 1870 is a part of the appellee's chain of title to these lands. Thus, in the Bell case, supra, speaking of both place and indemnity lands under the 1864 grant, the Supreme Court said (at page 687 of 183 U.S., at page 237 of 22 S.Ct.): "Undoubtedly the company acquires title to both classes of lands by the 3d section of the granting act; but it acquires a title to lands within the place limits by a present grant while to land within the indemnity limits, only by a future power of selection. In both cases the statute is the origin of the title; but in the one case it gives instantaneously; in the other it is a mere promise to give in the future, and requires the action of the railroad to perfect it."
 
 
 15
 In United States v. Northern Pacific Ry. Co., 256 U.S. 51, 64, 41 S.Ct. 439, 441, 65 L.Ed. 825, the case which gave rise to the resolution which authorized the Land Grant Case of 1940, the Court, again speaking of the 1864 act, said: "The provision relating to indemnity lands was as much a part of the grant and contract as the one relating to land in place, * * and it is apparent from the granting act and resolution that `it was the purpose of Congress in making the grant to confer a substantial right to land within the indemnity limits in lieu of lands lost within the place limits.' * * * Such rights are within the protection of the due process of law clause of the Constitution."
 
 
 16
 Since the Company thus acquired title to the lands here in question by virtue of the Joint Resolution of 1870, and since "the provision relating to indemnity lands was as much a part of the grant and contract as the one relating to lands in place," appellants argue that the settlement and preemption proviso of that act attaches to the land here involved as lands "hereby granted" under the 1870 act.
 
 
 17
 Appellants make a further suggestion as to why a holding that the 1870 proviso applied only to lands in the place limits and not to indemnity lands would produce a result which Congress was unlikely to intend. The suggestion is in substance as follows: Consider the effect of such a holding upon the place and indemnity lands opposite the additional line authorized by the 1870 Resolution between Portland and Puget Sound. A holding that the proviso had no application to those indemnity lands would mean that the place lands between Portland and Puget Sound would be open to settlement and preemption five years after the completion of the road, whereas the indemnity lands along that line, selected by the Company to replace lands not available in the place limit, would not be open to such settlement and preemption after their selection. This, appellant says, would be an absurd result, for the Company would acquire a better right under the secondary portion of the grant than under its primary portion.
 
 
 18
 It is no part of our function to express any view as to the application of the 1870 settlement and preemption proviso to the place or indemnity lands acquired by reason of the construction of the Portland-Puget Sound line of the road. So far as the lands here in question are concerned, that is to say, the lands in the secondary indemnity belt in Montana, although the Railroad could not have acquired title thereto, had not the 1870 Resolution been adopted, yet it is also true that the Railroad's right to acquire these lands stems from the Act of 1864.
 
 
 19
 Under the very terms of the Resolution creating the second indemnity belt the deficiency to be satisfied by selection there was a deficiency in the amount of lands that were called for by the Act of July 2, 1864.[5] Since the deficiency which arose in Montana and which gave rise to the right of selection in the second indemnity belt was a deficiency in the grant of 1864, it seems plain that the appellee acquired these lands under and by virtue of both the Act of 1864 and the Resolution of 1870.[6]
 
 
 20
 Just as it was held in the Land Grant Case of 1940 that the preemption proviso of 1870 did not apply retroactively to the lands acquired under the grant of 1864, so here we think it necessary to hold that it did not operate retroactively to affect selections based upon the quantities of lands fixed by the place limits of that grant. We come to the conclusion therefore that the provision of the settlement and preemption proviso did not apply to the lands here in question.
 
 
 21
 Reaching this conclusion makes it unnecessary that we consider other difficult problems which would have been presented were we to hold that the proviso applied to these lands.[7]
 
 
 22
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 In the State court the proceeding was denominated an application for a writ of mandamus. The question whether it was a "civil action" that could be removed to the federal court, or entertained there (see Title 28 U.S.C.A. §§ 1441, 1331 and 1332), is not discussed by the parties. Cf. Rosenbaum v. Bauer, 120 U.S. 450, 7 S.Ct. 633, 30 L.Ed. 743 with Ames v. State of Kansas, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482 and State ex rel. Glassell v. Shell Petroleum Corp., D.C.W.D. La., 20 F.Supp. 795. See Marshall v. Crotty, 1 Cir., 185 F.2d 622
 The Montana court has said that mandamus by police officers, dismissed by a respondent mayor of a city, to procure reinstatement, was not a civil action. Bailey v. Edwards, 47 Mont. 363, 133 P. 1095, 1097. It said, quoting from an earlier decision: "The civil action * * has reference exclusively to private * * * wrongs. * * * What is the nature of the proceeding called mandamus? `It is not applicable as a redress for mere private wrongs.' * * *. It can be resorted to only in those cases where the matter in dispute, in theory concerns the public, and in which the public has an interest." The present proceeding hardly fits that description of mandamus. The defendant is a private corporation; appellants are private individuals seeking to enforce individual private rights either as third party beneficiaries or as successors in interest to the Government under the Northern Pacific contract. Assuming that Montana permits such rights to be enforced through what it calls mandamus, that cannot control over view that the action is essentially a civil one, in the nature of a suit for specific performance, or for declaratory relief in conjunction with a prayer for a mandatory injunction. (On mandatory injunction see 38 Colum. L.R. 903) Cases like Marshall v. Crotty, supra, and Palmer v. Walsh, D.C.D. Or., 78 F.Supp. 64, involved attempts to mandamus public officials. Whatever Montana may call this, we think, for purposes of removal and district court jurisdiction, it is essentially a civil action.
 
 
 [2]
 There has been so much litigation relating to the Northern Pacific land grant that it is fair to assume a general familiarity with its provisions. A good short summary of them is that found in United States v. Northern Pacific Ry. Co., 311 U.S. 317, 328, 61 S.Ct. 264, 269, 85 L.Ed. 210, as follows:
 "The grant of 1864 was of the ten nearest alternate odd-numbered sections of public land, not mineral, on each side of every mile of the line as definitely located, in a state, and of twenty such sections in a territory. This grant was in praesenti. The lands thus granted are spoken of as `place lands.' They were in two belts each twenty miles wide in states, and forty in territories, parallel to the right of way.
 "Excepted from the grant were lands reserved, granted, appropriated, preempted, or subject to other claims and rights at the date of definite location. These exempted lands are spoken of as `lands lost to the grant.' In lieu of such lost lands the Act provided that other lands were to be selected by the company, under the direction of the Secretary of the Interior, from odd-numbered sections not more than ten miles beyond the place lands, on each side of the road. The two ten-mile strips thus defined are spoken of as `the first indemnity belts' or `the first indemnity limits.'
 "The Resolution of May 31, 1870, granted, as respects the additional line authorized between Portland and Puget Sound, place and indemnity lands, as granted for the original line by the Act of 1864 [13 Stat. 365]. It also authorized what are spoken of as `second indemnity' belts ten miles wide, on either side of the original indemnity limits, in any state or territory in which the company could not obtain the number of sections intended for it by its charter. This additional grant, however, was conditioned that lieu lands in the second indemnity limits might be chosen only in the same state or territory in which place lands were lost to the grant."
 
 
 [3]
 (At page 147 of 180 U.S., at page 312 of 21 S.Ct.) "`That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of landhereby granted shall not be liable to sale, or entry, or pre-emption before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, 1841 * * *, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled "An act to Secure Homesteads to Actual Settlers on the Public Domain," approved May 20th, 1862 * * *, shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre, when offered for sale.'"
 
 
 [4]
 The Court then went on to say (311 U.S. at pages 368-369, 61 S.Ct. at page 287): "A majority of the justices who heard this case are of opinion that the proviso of the Resolution of 1870 required the company to open the lands granted by the Resolution to pre-emption and settlement at the expiration of five years from the completion of the entire road in 1887, whether the lands were then subject to mortgage or not; that its failure so to do was a breach of its contract with the United States and that the Government is entitled, if it can, to prove any damage to it, or advantage to the company, which resulted from this breach of contract."
 It is noted that this does not define "the lands granted by the Resolution".
 
 
 [5]
 This portion of the Joint Resolution recites as follows:
 "* * * and in the event of there not being in any State or Territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by Congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the Secretary of the Interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such State or Territory, within ten miles on each side of said road, beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of eighteen hundred and sixty-four, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of susbequent to the passage of the act of July two, eighteen hundred and sixty-four."
 
 
 [6]
 The grant of 1864 was not, as appellee contends, of "a specified quantity of lands"; it was "not of lands by quantity but of lands in place or by description" (311 U.S. at page 375, 61 S.Ct. at page 290). But if all the odd numbered sections in the place limits of that grant were counted, the total would furnish a number of sections which represented the maximum obtainable. The deficiency in receipt of this total measured the quantity of "lieu" lands that might be selected. It is difficult to avoid the inference that in 1864 Congress anticipated that the first indemnity belts would be adequate. The provision in 1870 that "in the event of there not being in any State or Territory * * * the amount of lands per mile granted by Congress * * then said company shall be entitled * * to receive so many sections * * * within ten miles * * * beyond the limits," enlarged or amended the area of selection without adding a single section to the total quantity contemplated. In that sense the railroad's title to the lands in question stems from the grant of 1864
 
 
 [7]
 One serious question concerns the right of the appellants to enforce the provisions of the proviso. Since the Railroad was not a trustee of the lands (311 U.S. 368, 61 S.Ct. 287), it is not plain that appellants would be third party beneficiaries under the contract between the Government and the Railroad. If, on the other hand, appellant's claim is to have rights derived from or through the Government, a question would be presented whether they were not bound and foreclosed by the settlement of the Land Grant Case of 1940. See United States v. Northern Pac. Ry. Co., D.C., 41 F. Supp. 273