## BRANDON *v.* ARD.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 24.   Submitted April 29, 1908.—Decided October 19, 1908.

The policy of the Federal Government toward *bona fide* settlers upon the public lands is liberal and the law deals tenderly with them.

A homesteader who has done all that the law requires will not lose his rights on account of error of, or unauthorized action by, a public official. *Ard* v. *Brandon*, 156 U. S. 537.

Lands within indemnity limits of a railroad grant are not open for settlement under homestead laws until the map of definite location has been filed and their selection to supply deficiencies in place limits has been approved by the Secretary of the Interior; and their prior withdrawal by the Secretary from sale and settlement is unauthorized and does not affect the rights of *bona fide* settlers.   So *held* as to grants under the act of March 3, 1863, c. 98, 12 Stat. 772.

The act of March 3, 1863, c. 98, 12 Stat. 772, did not actually grant lands to which any claim of a *bona fide* settler had attached prior to definite location of the road.   *Sjoli* v. *Dreschel*, 199 U. S. 564.

In a suit brought by the Attorney General of the United States against a railroad company to cancel patents under the act of March 3, 1887, c. 376, 24 Stat. 556, the Attorney General represents only the United States; he cannot represent merely private parties.

A *bona fide* homesteader, not a party to an action brought by the Attorney General of the United States under the act of March 3, 1887, c. 376, 24 Stat. 556, against a railroad company to cancel the patent

issued to the company for the land entered by him is not a privy to or bound by the judgment against the United States; nor can the adjudication in such a case estop him from setting up his rights in the land for which the patent was issued. *United States* v. *M., K. & T. Ry. Co.*, 141 U. S. 358; *Ard* v. *Brandon*, 156 U. S. 537.

One not a party to an action brought by the United States to cancel patents and who is not otherwise a privy to, or bound by the judgment against the United States, is not made a privy thereto, or become bound thereby because he is a member of an association which urged the Government to bring the action.

74 Kansas, 424, affirmed.

THE facts are stated in the opinion.

*Mr. T. A. Pollock*, with whom *Mr. L. W. Keplinger* was on the brief, for plaintiffs in error:

The relations between the Government and Ard with respect to this land and Ard's relation to and connection with the suit were such as to render the decree in the case of *United States* v. *M., K. & T. Ry. Co.* conclusive against Ard as to the equities now claimed by him. *Graham* v. *Great Water Power Co.*, 76 Pac. Rep. 811; *Norton* v. *Evans*, 82 Fed. Rep. 804; *Kerrison* v. *Stewart*, 93 U. S. 155; *Manson* v. *Duncanson*, 166 U. S. 533; Freeman on Judgments (3d ed.), § 147; Black on Judgments, § 85; *Hornsly* v. *National Bank*, 60 S. W. Rep. 180; 24 Am. & Eng. Ency. Law (2d ed.), 737, 738; *Hanke* v. *Cooper*, 108 Fed. Rep. 738, 924; *Thaller* v. *Hershey*, 89 Fed. Rep. 576; *United States* v. *Beebe*, 127 U S. 338 (Government a trustee). Ard could have appealed. 3 Daniels (6th ed.), *1461; *Sage* v. *Central Railroad Co.*, 93 U. S. 412.

The withdrawal of March 19, 1863, withdrew the land in question from the category of public lands. *Northern Lumber Co.* v. *O'Brien*, 134 Fed. Rep. 303; S. C., 139 Fed. Rep. 614; *Wood* v. *Beach*, 156 U. S. 548; *Spence* v. *McDougal*, 159 U. S. 62; *Merrill* v. *Chicago Ry. Co.*, 70 Fed. Rep. 464; *Union Pacific Ry. Co.* v. *Atchison Ry. Co.*, 13 Fed. Rep. 106; *Wolcott* v. *Des Moines Co.*, 5 Wall. 681; *Wilcox* v. *Jackson*, 13 Pet. 498; *Leavenworth &c.* v. *United States*, 92 U. S. 745; *Railroad Co.*

v. *Freeman Co.*, 9 Wall. 94; see dissenting opinion, Brewer, J., *Nelson* v. *Nor. Pac. Railway Co.*, 188 U. S. 108.

The withdrawal of March 19, 1863, withdrew the land from the category of "public land" within the meaning of the words as used in the homestead preëmption acts and such withdrawal constituted a "reservation" within the meaning of said word as contained in said act. Same authorities as above. *Patterson* v. *Tatam*, 3 Sawy. 164; *Wolsey* v. *Chapman*, 101 U. S. 770; *Weaver* v. *Fairchild*, 50 California, 560; *Vicksburg* v. *Elmore*, 8 So. Rep. 727.

The rulings of the Land Department authorizing the decisions of this court sustaining withdrawals such as the one in question, and made prior to the time Brandon made his purchase constitute a rule of property in his favor. See cases cited in 13 Century Digest, c., 2163, § 336, and such rule having been established by Federal authority, it is the legal duty of the Government to uphold the title so acquired.

*Mr. Oscar Foust* for defendant in error:

The judgment against the United States in the case of *United States* v. *M., K. & T. Ry. Co.* is not conclusive in Brandon's favor in the case at bar. *Ard* v. *Brandon*, 156 U. S. 537; Black on Judgments, No. 540; 1 Freeman on Judgments (4th ed.), Nos. 188, 189; *Hall* v. *Finch*, 104 U. S. 261; *Patton* v. *Caldwell*, 1 Dall. 419; *Litchfield* v. *Crane*, 123 U. S. 551; *Apsden* v. *Nixan*, 4 How. 11; *Bank* v. *Stone*, 88 Fed. Rep. 413; *Australian Knitting Co.* v. *Gormley*, 138 Fed. Rep. 92; *Wilgus* v. *German*, 72 Fed. Rep. 773; *Pendleton* v. *Russell*, 144 U. S. 640; *Central Baptist Church* v. *Manchester*, 17 R. I. 492; *Jones* v. *Vert*, 121 Indiana, 140; *Cannon River &c. Assn.* v. *Rogers*, 42 Minnesota, 123; *Park* v. *Ensign*, 66 Kansas, 50; *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273; *Stryker* v. *Crane* (or *Goodnow*), 123 U. S. 527; *Brandon* v. *Ard*, 74 Kansas, 424; *Wilkie* v. *Howe*, 27 Kansas, 578; *Keizer* v. *Paper Co.*, 71 Kansas, 305.

The Kansas Supreme Court properly held that the letter

of withdrawal of March 19, 1863, was ineffectual to withdraw the land from the class of lands subject to homestead pre-emption, and that Ard acquired equities, by his settlement, as against Brandon. *L., L. & G. R. R. Co.* v. *United States,* 92 U. S. 733, 760; *M., K. & T. Ry. Co.* v. *Kansas Pac. Ry. Co.,* 97 U. S. 491; *Ard* v. *Brandon,* 159 U. S. 537; *Clements* v. *Warner,* 24 How. 394; *Duluth Iron Range R. R. Co.* v. *Ray,* 173 U. S. 587; *Weeks* v. *Bridgman,* 159 U. S. 541; *United States* v. *M., K. & T. Ry. Co.,* 141 U. S. 358; *Kansas Pac. Ry. Co.* v. *A., T. & S. F. R. R. Co.,* 112 U. S. 414; *Hewitt* v. *Schultz,* 180 U. S. 139; *Nelson* v. *Nor. Pac. Ry. Co.,* 188 U. S. 108; *Sjoli* v. *Dreschel,* 199 U. S. 564; *Southern Pac. Ry. Co.* v. *Bell,* 183 U. S. 675; *Holmes* v. *United States* (9th Circuit), 55 C. C. A. 489; *S. C.,* 118 Fed. Rep. 995; *Moore* v. *Carmode,* 180 U. S. 167; *Northern Pac. R. Co.* v. *Miller* (Secretary Vilas), 7 Land Dec. 100; *Shepley* v. *Cowan,* 91 U. S. 330.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case involves the title to a tract of land in Allen County, Kansas, containing eighty acres. It is described in the record as the northeast quarter of section 11, township 26, range 20, and will hereafter be alluded to as the tract in section 11. Adjoining that tract, in the same township, is another tract of eighty acres which will be hereafter referred to as the tract in section 2. The present writ of error does not involve the title to the tract in section 2, but it will conduce to a clear understanding of the questions raised as to the tract in section 11 if we recall certain acts of Congress, as well as the proceedings in the Land Department and the litigation that arose in the state and Federal courts about both tracts.

By an act of March 3, 1863, c. 98, 12 Stat. 772, Congress granted to Kansas every alternate odd section of public lands, for ten sections in width on each side, to aid in the construction of railroads and branches, as follows: first, of a railroad and telegraph line from Leavenworth, Kansas, on a named

route, with a branch to the southern line of the State in the direction of Galveston, Texas; second, of a railroad from Atchison, via Topeka, to the western line of the State, with a branch extending to a named point on the first-named road; one of the roads becoming subsequently known as the Leavenworth road, and the other as the Missouri-Kansas road.

After making the grant in the usual words, the act proceeded: "But in case it shall appear that the United States have, when the lines or routes of said road and branches are definitely fixed, sold any section or any part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected, for the purposes aforesaid, from the public lands of the United States nearest to tiers of sections above specified, so much land, in alternate sections or parts of sections, designated by odd numbers, as shall be equal to such lands as the United States have sold, reserved, or otherwise appropriated, or to which the rights of preëmption or homestead settlements have attached as aforesaid; which lands, thus indicated by odd numbers and selected by direction of the Secretary of the Interior as aforesaid, shall be held by the State of Kansas for the use and purpose aforesaid: *Provided*, That the land to be so selected shall, in no case, be located further than twenty miles from the lines of said road and branches: . . ."

By a statute passed February 9, 1864, c. 79, p. 149, Kansas accepted this grant upon the conditions prescribed by Congress, and the Leavenworth and the Missouri-Kansas Companies became entitled to claim the benefit of its provisions as to the lands on their respective routes.

A few days after the act of 1863 was passed—indeed, before the State had formally accepted the benefit of its provisions—the Senators and Representatives from Kansas requested the General Land Office to withdraw the public lands

along the specified routes of the railroads and branches proposed to be constructed. Pursuant to that request the Commissioner of the Land Office, on March 19, 1863,—without having received any map of general route, much less of definite location—sent to the Register and Receiver, at Humboldt, Kansas, a diagram showing the *probable* lines of the roads and their respective branches, as well as the ten-mile or place limits on each side, and directed that officer to "withhold from ordinary private sale or location, and also from preemption and homestead . . . all the public lands in your [his] district and lying within the ten-mile limits *are* [as] designated in said diagram." After referring to the acts of 1853 and 1854 (preëmption and homestead acts) the Commissioner proceeded: "You will, therefore, understand from the foregoing: 1st. That the odd sections within the limits of said railroads and branches are absolutely withdrawn from sale, preëmption, or homestead entry, except so far as inceptive rights may have accrued prior to the receipt by you of this order. . . . This order will take effect from the date of its reception at your office, and you will advise this office of the precise time it may be received by you."

The order of withdrawal was approved by the Secretary of the Interior and, was received at the local office May 5, 1863. After this withdrawal, Congress, by an act approved July 26, 1866, 14 Stat. 289, c. 270, made a grant of lands to Kansas to aid in the construction of a southern branch of the Union Pacific Railway and Telegraph Company from Fort Riley, Kansas, down the valley of the Neosho River to the southern line of Kansas. This act is referred to in the record, but it does not seem to have any special significance in the present case. Suffice it to say, that it contained provisions substantially like those in the act of 1863, which made it the duty of the Secretary of the Interior to select for the railroad company public lands nearest the place limits, equal to such amount as the United States appeared, at the time of the definite location of the road, to have "sold, reserved or other-

wise appropriated, or to which the right of homestead settlement or preëmption has attached."

Under date of April 30, 1867 the Land Office transmitted to the local land office at Humboldt, Kansas, a map of the actual location of the railroad for which the grant was made by Congress in the act of 1863. The diagram showed the ten-mile or granted limits of that road, and directed the withholding from sale or location, preëmption or homestead entries all the odd sections within the limits of twenty miles as laid down on that diagram.

After the above withdrawal—which, as we have stated, was made in 1863 solely at the request of the Kansas Senators and Representatives—Ard, who was admittedly qualified to take the benefits of the homestead laws, went upon the above two tracts, in June, 1866, intending, in good faith, to perfect a title to them under the homestead laws. He made substantial improvements upon them, and in July, 1866, in the accustomed way, made a homestead application at the local land office for the 160 acres. These two tracts of eighty acres each were so situated that they could have been legally embraced in one homestead entry. Ard's application was denied by the local office upon the ground, among others, that the land was within the place or granted limits of one of the aided roads. At that time the Missouri-Kansas Company—under whom the plaintiffs in error claim—had not filed any map of definite location. No such map was filed until December 6, 1866. In the spring of 1867 Ard did further work on the land, building a house thereon, and about July 1st of that year he again applied at the local land office, under the homestead laws, for the land. This application was also denied on the same grounds as were assigned in reference to his original application. In 1872 he made a more formal application, but was again repulsed by the Commissioner of the Land Office. Yet he did not abandon his claim, but held steadily to the purpose of obtaining the entire 160 acres under the homestead laws, and remained in open, notorious possession, assert-

ing his right to the land. And he has continuously occupied the land *ever since June*, 1866.

It should be stated in this connection that after the rejection of Ard's original homestead application upon the mistaken ground that the lands were within the place or granted limits of one of the roads, it was ascertained that neither of the tracts was within place limits, but both were within the overlapping indemnity limits of the respective roads. The tract in section 11 was selected as indemnity for lands lost jointly by the two companies, and was patented by the State to the Missouri-Kansas Company on May 19, 1873. The company knew when it selected the land to supply alleged deficiencies in place limits as well as when it took the patent from the State, that Ard was in actual possession, claiming the land under the homestead laws. The tract in section 2 was selected by the same company on April 14, 1873, and on November 3, 1873, it received a patent for it directly from the United States.

C. H. Pratt having purchased from the Missouri-Kansas Company the tract in section 2, and Brandon having purchased from the same company the tract in section 11, each commenced a separate action of ejectment against Ard in a state court. Judgment went against Ard in each case, and he was also unsuccessful in the Supreme Court of Kansas. *Ard* v. *Pratt*, 43 Kansas, 419; *Ard* v. *Brandon*, 43 Kansas, 425.

Ard then brought both cases here, and the judgments were reversed, further proceedings being ordered to be taken in accordance with the opinion of this court. *Ard* v. *Brandon*, 156 U. S. 537. What this court said bears directly upon the case as now presented. Mr. Justice Brewer, delivering the judgment of the court, referred to the testimony—and the same facts appear in the present record—and observed that by reason of his occupancy and improvement of the land for the purpose of a homestead and by his homestead application —all of which was prior to the withdrawal of the lands by the Land Department—Ard, who had admittedly the requisite qualifications under the homestead laws, acquired an equitable

right to the land that could not be displaced by the wrongful act of the local land office. After referring to the case of *Shepley* v. *Cowan,* 91 U. S. 330, 338, the court proceeded, p. 542: "Within the authority of that case we think the defendant has shown an equity prior to all claims of the railway company. He had a right to enter the land as a homestead; he pursued the course of procedure prescribed by the statute; he made out a formal application for the entry, and tendered the requisite fees, and the application and the fees were rejected by the officer charged with the duty of receiving them— and wrongfully rejected by him. Such wrongful rejection did not operate to deprive defendant of his equitable rights, nor did he forfeit or lose those rights because, after this wrongful rejection, he followed the advice of the register and sought in another way to acquire title to the lands. The law deals tenderly with one who, in good faith, goes upon the public lands, with a view of making a home thereon. If he does all that the statute prescribes as the condition of acquiring rights, the law protects him in those rights, and does not make their continued existence depend alone upon the question whether or no he takes an appeal from an adverse decision of the officers charged with the duty of acting upon his application. 'The policy of the Federal government in favor of settlers upon public lands has been liberal. It recognizes their superior equity to become the purchasers of a limited extent of land, comprehending their improvements, over that of any other person.' *Clements* v. *Warner,* 24 How. 394, 397. There can be no question as to the good faith of the defendant. He went upon the land with the view of making it his home. He has occupied it ever since. He did all that was in his power in the first instance to secure the land 'as his homestead. That he failed was not his fault; it came through the wrongful action of one of the officers of the government."

Subsequently, after the return of the above cases to the inferior state court, Pratt, the claimant of the tract in section 2, abandoned his ejectment suit against Ard, and the

United States brought an action in the United States Circuit Court for Kansas against the Missouri-Kansas Company and other railroad companies to cancel certain patents that had been issued for lands in Allen County, Kansas, including the one issued to the Missouri-Kansas Company for the tract in section 11. *United States* v. *Missouri, K. & T. Ry. Co.,* 141 U. S. 358. Brandon was made a defendant in that action because he asserted rights in lands covered by some of the patents sought to be canceled. But Ard was not made a party, although some of the evidence in the case had reference to the tract in section 11, as well as to the circumstances under which he occupied it. That action was brought by the Attorney General of the United States at the request of the Secretary of the Interior, who proceeded under the act of Congress of March 3, 1887, 24 Stat. 556, c. 376. That act directed the Secretary "to immediately adjust, in accordance with the decisions of the Supreme Court, each of the railroad land grants made by Congress to aid in the construction of railroads and heretofore unadjusted." In that action the Government was unsuccessful in both the Circuit Court and in this court, but not, as we shall presently see, on any question determinative of the issue now presented as between Brandon's heirs and Ard.

Later on, the present case, so far as it involved the title to section 11, as between Brandon and Ard, was again heard upon its merits in the state court, and judgment went in favor of Ard. That judgment was affirmed by the Supreme Court of Kansas, which had before it the judgments in *Ard* v. *Brandon,* 156 U. S. 537, and in *United States* v. *M., K. & T. Ry. Co.,* 141 U. S. 358.

Subsequently, after the decision in *Ard* v. *Brandon,* 156 U. S. 537, Ard renewed his application, under the homestead laws, for both tracts. Having made the proper proofs, and paid the required fees, his application was approved and a patent issued to him by the United States on October 17, 1900, under the homestead law of 1862 and the acts supple-

mentary thereto. That patent was put in evidence at the last hearing of this cause in the inferior state court and was part of the record in this case when it was before the Supreme Court of Kansas, whose judgment is now here for review.

In our opinion the determination of the present case depends upon the conclusions that may be reached on two questions.

1. We cannot give to the withdrawal from sale, preëmption or settlement of the lands upon which Ard entered in 1866 the legal effect which the plaintiffs in error insist must be given to it. It is conceded that the lands were not within the place or granted limits of either railroad, but were within indemnity limits. According to the decisions of this court, they were therefore open to settlement under the homestead laws up to the time of their being selected to supply deficiencies in place limits, with the approval of the Secretary of the Interior after the filing of a map of definite location. The withdrawal of them from sale, or settlement, simply at the request of Senators and Representatives from Kansas, prior to the definite location of the road and before they were regularly selected to supply deficiencies in place or granted limits, was without authority of law. Such unauthorized withdrawal did not stand in the way of Ard, in virtue of his settlement on them in 1866 under the then existing homestead laws, from acquiring such an interest in the lands as would be protected against their subsequent selection by the railroad company. The acts of Congress cannot be construed as actually *granting* lands to which had attached, *before the definite location of the road,* any claim or right under the homestead laws. A claim or right did attach to these lands in favor of Ard before any map of definite location was made or filed and before they were selected for the railroad company to supply alleged deficiencies in place limits. What we have said is in conformity with numerous decisions of this court cited in the margin.[1]

---

[1] *Hewitt v. Schultz,* 180 U. S. 139; *Nelson v. Nor. Pac. Ry. Co.,* 188

The cases cited were referred to in a recent case in this court—*Sjoli* v. *Dreschel*, 199 U. S. 565. It was there held that those cases established, among other propositions, the follow-' ing: "That the railroad company will not acquire a vested interest in particular lands, within or without place limits, merely by filing a map of general route and having the same approved by the Secretary of the Interior, although upon the definite location of its line of road and the filing and acceptance of a map thereof in the office of the Commissioner of the General Land Office, the lands within primary or place limits, not theretofore reserved, sold, granted or otherwise disposed of and free from preëmption or other claims or rights, become segregated from the public domain, and no rights in such place lands will attach in favor of a settler or occupant, who becomes such after definite location; that no rights to lands within indemnity limits will attach in favor of the railroad company until after selections made by it with the approval of the Secretary of the Interior; that up to the time such approval is given, lands within the indemnity limits, although embraced by the company's list of selections, are subject to be disposed of by the United States or to be settled upon and occupied under the preëmption and homestead laws of the United States; and that the Secretary of the Interior has no authority to withdraw from sale or settlement lands that are within indemnity limits which have not been previously selected, with his approval, to supply deficiencies within the place limits of the company's road."

U. S. 108; *United States* v. *Nor. Pac. R. R. Co.*, 152 U. S. 284, 296; *Nor. Pac. R. R. Co.* v. *Sanders*, 166 U. S. 620, 634, 635; *Menotti* v. *Dillon*, 167 U. S. 703; *United States* v. *Ore. & Cal. R. R. Co.*, 176 U. S. 28, 42; *St. Paul & P. R. R. Co.* v. *Nor. Pac. R. R. Co.*, 139 U. S. 1, 5; *St. Paul & Sioux City R. R. Co.* v. *Winona & St. Peter R. R. Co.*, 112 U. S. 720, 723; *M., K. & T. Ry. Co.* v. *Kansas P. Ry. Co.*, 97 U. S. 491, 501; *Cedar Rapids & Missouri River R. R. Co.* v. *Herring*, 110 U. S. 27, 28; *Grinnell* v. *Railroad Co.*, 103 U. S. 739; *Kansas Pacific R. R. Co.* v. *Atchison, T. & S. F. R. R. Co.*, 112 U. S. 414; *Wilcox* v. *Eastern Oregon Land Co.*, 176 U. S. 51.

It is true that the cases above referred to arose under acts of Congress that did not relate in terms to grants of lands to the State of Kansas to aid in the construction of railroads. But they are none the less in point here; for the provisions in them as to homestead rights attaching prior to definite location, are, in substance, the same as are found in the above acts of Congress relating to lands granted to Kansas.

2. When we recall what this court (as above quoted) said in *Ard* v. *Brandon,* 156 U. S. 537, about Ard's rights in respect of these identical lands, there is no room to doubt the correctness of the judgment of the Supreme Court of Kansas in his favor, unless we hold, as plaintiffs contend we should, that Ard is concluded by the decision of the Circuit Court of the United States in the action brought by the United States to cancel certain patents issued to the Missouri-Kansas Company. But we cannot so hold. As already stated, Ard was not, and was not sought to be made, a party to that action. He had no control of it and was not entitled of right to be heard or to adduce evidence in it. He was not in any legal sense represented in the case, nor can he be regarded as privy to the issue between the United States and those whom it sued. His membership in the Settlers' Protective Association —which association, it is said, induced the United States to bring the action referred to—did not so connect him, in law, with the litigation as that the judgment therein would bind him or be conclusive evidence against him. It must be assumed that the Attorney General of the United States sued the Missouri-Kansas Company only in the discharge of his official duty, and for the purpose of asserting the rights of the Government *as against that company.* He could not have represented merely private parties in that suit; he represented only the United States. Ard was not, in any legal sense, a privy to the issue of record between the United States and its opponents, although the validity of the patent received by the Missouri-Kansas Company for the land here in question— under which company the present plaintiffs in error claim—

was directly disputed by the Government in that case. It is said that Ard was an active member of the Settlers' Protective Association. But that is not a controlling fact. It may be, as alleged, that, in respect of the patents issued to it, the Government was induced to proceed against that company by the representations made and the facts brought to its attention by that association. But that circumstance did not so connect the association with the suit as to make the judgment binding upon its individual members in a suit between other parties. In suing the Missouri-Kansas Company the officers of the Government acted wholly upon their independent judgment as to the validity of the patents it had issued, and as to what was its duty to those who had previously acquired rights in the particular public lands covered by those patents. The issue in that case was only as to the respective rights of the United States and the Missouri-Kansas Company, *as between each other.* There was no issue between the company or those claiming under it and Ard, who was in actual possession, claiming equitable rights in the lands in dispute by reason of his occupancy of them under the homestead laws. In *United States* v. *Missouri-Kansas Company,* above cited, 141 U. S. 358, the bill referred to those acts of the land officers which had the effect to prevent settlers from acquiring rights which they were entitled to acquire under the homestead and preëmption laws. The court, alluding to those allegations, said: "If the facts are as thus alleged, it is clear that the Missouri-Kansas Company holds patents to land both within the place and indemnity limits of the Leavenworth road which equitably belong to *bona fide* settlers who acquired rights under the homestead and preëmption laws, which were not lost by reason of the Land Department having, by mistake or an erroneous interpretation of the statutes in question, caused patents to be issued to the company. The case made by the above admitted averments of the bill is one of sheer spoliation upon the part of the company of the rights of settlers, at least of those whose rights attached prior to the

withdrawal of 1867; whether of others, it is not necessary, at this time, to determine." And in *Ard* v. *Brandon,* 156 U. S. 537, 541, the court referring to the language just quoted, and to the transfer of the legal title by the patent of the United States to the Missouri-Kansas Company, said: "But it is equally clear under the authority of the last cited case [*United States* v. *Missouri, K. & T. R. R. Co.*], as well as of many others, that no adjudication against the Government in a suit by it to set aside a patent estops an individual not a party thereto from thereafter setting up his equitable rights in the land for which the patent was issued."

It results that, in the present case, involving only the title to the tract of eighty acres in section 11, that, by his rightful occupancy of that tract, under and in conformity with the homestead laws, before any interest therein was legally acquired by the railroad company, Ard's equitable rights, thus accruing and supported at the final hearing by a patent from the United States, must prevail.

For the reasons stated, the judgment of the Supreme Court of Kansas is

*Affirmed.*

Mr. Justice Brewer took no part in the decision of this case.