UNITED STATES v. MIDWAY NORTHERN OIL CO. et al.

(District Court, S. D. California, N. D. May 29, 1914.)

No. 47.

MINES AND MINERALS (§ 2*)—PETROLEUM LANDS—WITHDRAWAL FROM ENTRY—AUTHORITY OF PRESIDENT—"TERRITORY."

Under Const. art. 4, § 3, vesting in Congress power to dispose of and make all needful rules and regulations respecting the territory and other property of the United States, the term "territory" being equivalent to the word "land," and the Revised Statutes declaring that all valuable mineral deposits in land belonging to the United States are open to exploration and purchase and the lands to occupation and purchase, and that any person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum or other mineral oils, and chiefly valuable therefor under the laws relating to placer mining claims, the power to withdraw petroleum lands from entry is vested solely in Congress, and hence the President had no constitutional authority to withdraw from entry over 3,000,000 acres of oil land in California and Wyoming in aid of proposed legislation affecting the use and disposition of petroleum deposits on the public domain.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2; Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 8, pp. 6925–6927, 7814.]

In Equity. Bill by the United States of America against the Midway Northern Oil Company and others to nullify defendants' alleged rights in certain public land sought to be entered after an attempted withdrawal from entry by the President, September 27, 1909. Bill dismissed.

E. J. Justice, Sp. Asst. to Atty. Gen. (A. I. McCormick, of Los Angeles, Cal., and Wm. Denman, of San Francisco, Cal., of counsel), for the United States.

Geo. E. Whitaker, of Bakersfield, Cal., for certain defendants.

A. L. Weil, of San Francisco, Cal., for certain defendants.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for certain defendants.

Oscar Lawler, of Los Angeles, Cal., for certain defendants.

Frank L. Short, for certain defendants.

DOOLING, District Judge. The bill avers, in substance, that defendants subsequent to March 1, 1910, entered upon the N. W. ¼ of section 32, township 12 N., range 23 W., S. B. M., which was then, and ever since has been, the property of plaintiff, and on June 6, 1910, discovered therein petroleum in paying quantities; that on September 27, 1909, the President regularly withdrew said land and the whole thereof from mineral exploration, and from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land laws of the United States, and reserved the same for public uses, to wit, in order to secure a supply of fuel oil for the use of the navy, and that since said last-mentioned date none of

said land has been subject to exploration for minerals, or to the initia-tion of any right under any of the public land laws of the United States. That defendants are now extracting vast quantities of min-eral oil and petroleum from said lands, and committing waste and tres-pass thereon to plaintiffs' irreparable injury, and that defendants are so doing under the pretense that they have acquired valid mineral rights therein, by virtue of their entry upon said land and exploration and development thereof, and discovery of oil therein, but that by rea-son of such order of withdrawal of September 27, 1909, such claim of right is unfounded. The bill asks for an injunction, a receiver, an ac-counting, and a decree that defendants have no estate, right, or title to said land, or to any of the minerals contained therein, and that it be decreed that plaintiff has a perfect property in said land free and clear of any of the claims of defendants, and each and every one of them. The case turns upon the validity or invalidity of the executive withdrawal order of September 27, 1909, which order is as follows:

"Temporary Petroleum Withdrawal No. 5."

"In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land laws. All locations or claims existing and valid on this date may pro-ceed to entry in the usual manner after field investigation and examination."

The accompanying lists embraced 3,041,000 acres of land, 170,000 acres thereof being in Wyoming and 2,871,000 acres in California. In-cluded in this latter quantity is the land described in the bill.

It will be observed that while the bill declares the purpose of the withdrawal to have been to secure for the navy a supply of fuel oil, the order itself makes no such declaration, but states the purpose to be "In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain," and the history of the move-ment to secure such legislation indicates that the executive was dis-satisfied with the existing laws in regard to the disposition of petro-leum deposits and hoped to have them changed. It may be added, too, that the bill as originally filed contained no reference to the use of oil by the navy, but that this averment was added by an amendment made on the very day that the motion to dismiss was called for argument, although the bill itself had been filed nearly a year before.

At the time of this withdrawal, and at the time of defendants' entry upon the land, there were in force, and still remain in force the fol-lowing statutory provisions:

"That all valuable mineral deposits in lands belonging to the United States * * * are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase; * * * and that claims usually called 'placers' including all forms of deposit, ex-cepting veins of quartz or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceed-ings, as are provided for vein or lode claims."

"That any person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum or other mineral oils, and chiefly valuable therefor, under the provisions of the laws relating to placer mineral claims."

It is under these statutes that defendants claim. The effect of the withdrawal order, if valid, was to suspend the operation of these statutes, at least to the extent of withholding their application to such portion of the 3,041,000 acres of land described as still remained a part of the public domain.

The Constitution (article 4, section 3) vests in Congress the power to dispose of and make all needful rules and regulations respecting territory or other property of the United States, and it was early decided that "the term 'territory,' as there used, is merely descriptive of one kind of property; and is equivalent to the word 'lands'"; that "Congress has the same power over lands as over any other property belonging to the United States, and that this power is vested in Congress without limitation." United States v. Gratiot, 14 Pet. 526, 10 L. Ed. 573. The same proposition is differently, but no less forcibly stated as follows in other cases:

"No appropriation of public land can be made for any purpose, but by authority of an act of Congress." United States v. Fitzgerald, 15 Pet. 407, 10 L. Ed. 785.

"But public and unoccupied lands, to which the United States have acquired title, Congress * * * under the power conferred upon it by the Constitution, * * * has the exclusive right to control and dispose of, as it has with regard to other property of the United States." Van Brocklin v. State of Tennessee, 117 U. S. 151, 6 Sup. Ct. 670, 29 L. Ed. 845.

"The Constitution vests in Congress the power to 'dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.' And this implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise." Wisconsin R. R. Co. v. Price County, 133 U. S. 496, 10 Sup. Ct. 341, 33 L. Ed. 687.

"With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations. Congress has the absolute right to prescribe the times, the conditions, and the mode of transferring this property, or any part of it, and to designate the persons to whom the transfer shall be made." Gibson v. Chouteau, 13 Wall. 92, 20 L. Ed. 534.

Congress, therefore, having the exclusive power to dispose of the land in question, and to make all needful rules and regulations in relation thereto, and having declared the minerals therein to be free and open to exploration and purchase and the land itself to occupation and purchase, under the placer mining laws, the operation of such laws should not be interfered with by any other department unless a clear authority exist for such interference. It is claimed by plaintiff that such authority does exist, having its basis in long acquiescence by Congress in the exercise by the executive of the power to reserve public lands for public purposes, and in the approval by Congress of the exercise of this power in many instances other than the one in question. It is also claimed that such authority inheres in the executive under the Constitution, subject only to the paramount authority of Congress. Many times the executive has withdrawn lands in the past, and many times Congress has either directly or indirectly approved such withdrawals. Many times, too, Congress has affirmatively authorized such withdrawals in advance of their making. The right to make such withdrawals has also frequently been passed upon by the courts in con-

crete and specific cases. In many instances such right has been upheld, in others it has not. An examination of the adjudicated cases upon this point, however, seems to me to indicate that in every instance where the right to make such withdrawals was upheld in the absence of congressional authorization, either direct or clearly to be implied, it was either because the lands withdrawn were actually devoted to a specific public purpose before the right of any third person had intervened, or because such withdrawal was necessary in order fully to effect the purposes of some existing law. An example will serve to illustrate each of these classes of cases.

In Grisar v. McDowell, 6 Wall. 363, 18 L. Ed. 863, decided by the Supreme Court in 1867, the question involved a military reservation which had been long occupied by the government for military purposes, and was indeed actually in the possession of the government and used for such purposes at the time the controversy arose, and the court said:

"From an early period in the history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses. The authority of the President in this respect is *recognized* in numerous acts of Congress. * * * The action of the President in making the reservations in question was indirectly approved by the legislation of Congress in appropriating moneys for the construction of fortifications and other public works upon them. The reservations made at the same time embraced seven distinct tracts of land, and upon several of them extensive and costly fortifications and barracks and other public buildings have been erected."

This case taken in its entirety does not seem to me to support the proposition that 3,000,000 acres of land may be withdrawn by executive order from the operation of the laws enacted by Congress specifically providing for its disposition.

The so-called Des Moines River Cases will illustrate the second broad class of cases in which withdrawal orders have been upheld. In 1846, for the purpose of aiding to improve the Des Moines river from its mouth to Racoon creek, Congress granted to the territory of Iowa certain lands, being one equal moiety in alternate sections on a strip five miles in width on each side of said river. A doubt soon arose as to whether this grant carried any of the lands along the river above Racoon creek, and the first secretary having to do with the question was of the opinion that the grant did embrace such lands, and consequently reserved them from sale in order to carry out the law as construed by him. The validity of such reservation was before the Supreme Court in several cases, in each of which it was upheld, the court saying in one of them:

"Besides, if this power was not competent, which we think it was ever since the establishment of the land department, and which has been exercised down to the present time, the grant of 8th August, 1846, carried along with it, by necessary implication, not only the power, but the duty, of the land office to reserve from sale the lands embraced in the grant. * * * That there was a dispute existing as to the extent of the grant of 1846 in no way affects the question. The serious conflict of opinion among the public authorities on the subject made it the duty of the land officers to withhold the sales and reserve them to the United States till it was ultimately disposed of." Wolcott v. Des Moines Co., 5 Wall. 681, 18 L. Ed. 689.

One of the grounds therefore upon which the reservation was held to be valid was the necessity of preserving intact the full measure of the grant, and to this extent at least the reservation was made in order that the provisions of the law, if it should ultimately be determined that the lands above Racoon creek were embraced therein, might be put fully into effect.

It has been held in later cases that the executive has no general power to withdraw lands from the operation of existing laws. In Southern Pacific R. R. Co. v. Bell, 183 U. S. 675, 22 Sup. Ct. 232, 46 L. Ed. 383, the court says:

"The power of the secretary to withdraw lands is exercised for the purpose of carrying out the grant to the railroad, and to prevent lands covered by said grant from being taken up by settlers before the road is completed and the patents issued to the company; but clearly that power cannot be exercised to withdraw lands which are beyond the intended limits of the grant."

So in Brandon v. Ard, 211 U. S. 11, 29 Sup. Ct. 1, 53 L. Ed. 68, where a grant was made in March, 1863, an attempted withdrawal in May, 1863, and a homestead settlement in June, 1866, over three years later, and when the withdrawal order, if effective at all, had been over three years in effect, the court speaking also of indemnity lands, says again:

"We cannot give to the withdrawal from sale, pre-emption or settlement of the lands upon which Ard entered in 1866 the legal effect which the plaintiffs in error insist must be given to it. It is conceded that the lands were not within the place or granted limits of either railroad, but were within indemnity lands. * * * The withdrawal of them from sale, or settlement, * * * prior to the definite location of the road and before they were regularly selected to supply deficiencies in place or granted limits, was without authority of law. Such unauthorized withdrawal did not stand in the way of Ard, in virtue of his settlement on them in 1866, under the then existing homestead laws, from acquiring such an interest in the lands as would be protected against their subsequent selection by the railroad company."

In a still later case the court again says:

"A rejection upon the ground stated was not authorized, for the Secretary of the Interior had no authority to withdraw from settlement lands within the indemnity limits of the grant which had not been before selected, and approved by him." Osborn v. Froyseth, 216 U. S. 571, 30 Sup. Ct. 420, 54 L. Ed. 619.

It is clear, therefore, that no general power of withdrawal exists, and while withdrawal orders have been very frequently upheld, I find no case broad enough to cover the withdrawal of over 3,000,000 acres of land from the operation of the mineral land laws, whether "in aid of proposed legislation," as stated in the order, or for the purpose of securing a supply of fuel oil for the navy as stated in the bill. I am fully aware of the importance of this and kindred cases because of the magnitude of the interests involved. But they are still more important because of the legal principles upon which they must be determined. The effect of the order of withdrawal of September 27, 1909, whatever its purpose, was practically to suspend the operation of the mineral laws as applied to the petroleum deposits in the public domain. If such power exist, plaintiff should be able to point to some clear legislative or constitutional provision upon which it rests. I am not

content to seek for it in the dicta of decisions, or in some shadowy twilight zone lying between the powers expressly granted to the Congress and the powers expressly granted to the President. The power to dispose of the public lands has been given to the Congress by the Constitution, and I find no conflicting power granted the President by that instrument derogatory to the power given the Congress in this regard. The congressional will as to these lands is clearly expressed in the laws above cited, and the right to nullify this will is not lodged in either the executive or judicial department. On the contrary, it is equally the duty of the executive as of the judicial department to see that this will is carried into effect. The promulgation of the order in question I believe to be but one manifestation of a growing tendency to concentrate in the executive more of power than can be traced to any specific constitutional or legislative provision. As this tendency in the present instance leads to an encroachment upon the domain of the Congress, I am unwilling to further it by any decree of this court, and for this reason it is ordered that the application for an injunction and a receiver be denied, and the bill itself dismissed.